Filed 5/27/22  P. v. Rowe CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>AARON BRIAN ROWE,<br><br>     Defendant and Appellant. | F078149<br><br>(Super. Ct. No. VCF275617A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Keith P. Sager, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

This matter was tried as a capital case.  After a seven-week trial, Aaron Brian Rowe (appellant) was acquitted of first degree torture murder, but found guilty of second degree murder (Pen. Code, § 187, subd. (a); count 1).  Appellant was also acquitted of

assault on a child causing death but found guilty of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)). The victim was appellant's 47-day-old daughter, Peyton. The trial court sentenced appellant to prison for a term of 15 years to life for count 1 and imposed a three-year term for count 2, which was stayed pursuant to Penal Code section 654.

At trial, appellant's defense was accident or, at most, involuntary manslaughter for failing to seek medical attention after an accident. On appeal, appellant contends that (1) the trial court abused its discretion in allowing medical experts to testify that Peyton's injuries were nonaccidental and traumatic in nature; (2) admission of evidence of uncharged acts of domestic violence violated appellant's rights to due process and a fair trial; (3) the trial court erred in admitting evidence of uncharged domestic violence against one former girlfriend, as it fell outside the five-year limit of Evidence Code section 1109, subdivision (d)(3)[1]; (4) the trial court abused its discretion when it allowed the prosecutor to impeach a defense witness with evidence of a prior inconsistent statement; (5) the trial court erred in allowing the prosecutor to impeach another defense witness with prior statements made to a prosecution investigator; (6) the trial court abused its discretion when it declined to strike the entirety of testimony given by a prior victim of domestic violence; (7) the trial court abused its discretion and violated appellant's constitutional rights when it allowed the prosecutor to present expert testimony on intimate partner battering and the cycle of violence; (8) the trial court's instruction on the use of uncharged domestic violence evidence against appellant's former partners and other child reduced the prosecution's burden of proof; (9) the trial court erred in instructing on character evidence with CALCRIM No. 350; (10) the convictions must be reversed due to repeated instances of prosecutorial misconduct; (11) the trial court abused its discretion when it directed the jury to continue deliberating to

---

[1] All further statutory references are to the Evidence Code unless otherwise stated.

reach a verdict; and (12) cumulative error.  We find no prejudicial error and affirm the judgment.

## STATEMENT OF FACTS

A.  PROSECUTION'S CASE IN CHIEF

*1.  Initial Response and Attempts to Save Peyton's Life*

Late in the evening November 12, 2012, police officers and paramedics were dispatched to a residence in response to a report of an unresponsive infant.  Paramedic Johnny Rieke arrived and found appellant performing CPR on the infant, appellant's 47-day-old daughter Peyton, who was lying on the floor.  Rieke picked Peyton off the floor, did not feel a pulse, and found her to be "pale, cool, with no signs of life."  Rieke began chest compressions while transferring Peyton to an ambulance and continued chest compressions enroute to the hospital, but Peyton showed no change.  Rieke noted some bruising on the left side of Peyton's face.  Peyton's mother, Courtney J.,[2] went along in the ambulance.

When Peyton arrived at the hospital, she did not have a heartbeat and was not breathing.  All life saving measures—continued CPR, an intubation tube placed into her airway, an IV placed in her right foot to deliver medications and fluids, another IV placed in the subcutaneous tissue on her head, and an interosseous catheter placed into the bone on the top of her right shoulder—were unsuccessful and Peyton was pronounced dead just after midnight.

Peyton's body was X-rayed and Dr. Chad Kahwaji, the emergency room attending physician, noted acute fractures to Peyton's humerus and femur, as well as bruising around her eye.  Dr. Kahwaji stated in his report that the fractures did not appear to be spiral fractures but appeared consistent with blunt force trauma.  Dr. Kahwaji testified

---

[2]     We identify various people by first name only to protect their privacy and/or avoid confusion.

3.

that he had never seen a situation where an IV insertion had caused any type of bone fracture. Numerous photographs were taken of Peyton's body both before and after the subsequent autopsy.

### 2. Police Investigation

Police Detective Ken Smythe was assigned to investigate Peyton's death and spoke to appellant and Courtney at the hospital after Peyton was pronounced dead. Appellant told Smythe that Courtney had recently returned to work after maternity leave. On the night of Peyton's death, Peyton was congested and having trouble taking formula from a bottle. Courtney went to sleep between 9:00 and 9:30 p.m. and appellant stayed up with Peyton. Appellant was able to get Peyton to take some formula and he then put her in a mechanical swing to help her fall asleep. Once asleep, appellant transferred Peyton to her crib in her room and he went to the living room to watch TV. According to appellant, he checked on Peyton every five minutes to see if she was sleeping comfortably. At some point, he noticed that she was not breathing. He woke Courtney and called 911.

Detective Smythe, who had been informed that Peyton had sustained fractures to her right femur and humerus, asked appellant how those injuries could have occurred. Appellant told Smythe that, a few days prior, appellant was carrying Peyton when he tripped over the dog, causing him to stumble and fall to the floor while holding Peyton. The incident had happened the first day appellant was alone with Peyton after Courtney had returned to work. Appellant texted Courtney about the fall and asked her to come home during her lunch break, which she did. They did not take Peyton to the doctor.

Several days after speaking with appellant and Courtney jointly, Detective Smythe spoke to each separately at the police station. The interviews were recorded. During this interview, appellant told Smythe that, on the night of Peyton's death, he had checked on her about every 30 minutes. Appellant showed no emotion when shown Peyton's autopsy photos. Appellant told Smythe that an injury to Peyton's ear must have occurred

4.

during the fall. This time when describing the fall, appellant told Smythe that Peyton hit the ground and he fell on top of her, but he did not think he had injured her.

Courtney told Detective Smythe that the ear injury happened a couple of days prior to the fall. Peyton's ear had been swollen and appellant attempted to reduce the swelling by rubbing the earlobe. Courtney told Smythe that appellant did not think the injury required a doctor visit and that the swelling would go down on its own.

3. *Autopsy*

A full body CT scan was done prior to conducting an autopsy on Peyton. The forensic pathologist, Dr. Burr Hartman, reviewed the scan with the radiologist and then performed an autopsy on Peyton, who weighed about 4.49 pounds at the time.

During his external examination of Peyton, Dr. Hartman observed bruising on her face, head, ear, left leg, chest, eyelids, and puncture marks on her shoulder and arms. Dr. Hartman opined that the bruising on her eyelids and the puncture marks likely occurred during the resuscitation efforts, but he did not consider the rest of the amount of bruising normal for a 47-day-old infant.

Dr. Hartman also found a "freely mobile" fracture on Peyton's right humerus and femur. There was bleeding around the femur fracture, which would indicate that it occurred when Peyton's heart was still beating. Dr. Hartman observed fracture callouses on Peyton's left femur, left humerus, and left posterior ribs, which form after a bone has been fractured and is healing. Dr. Hartman opined that the rib fractures were about two weeks old and are "not seen with resuscitation" but with "child abuse."

Dr. Hartman observed "quite a bit of bleeding" in Peyton's brain, likely caused by a trauma. Peyton's brain and eyes were removed and sent to Stanford Medical Center for further examination.

Dr. Hartman took bone samples, decalcified them, and examined them microscopically. The bones appeared to be normal, and Dr. Hartman did not observe any bone abnormalities that one would see in brittle bone disease, also known as osteogenesis

5.

imperfecta (OI). The radiologist did not observe any evidence of brittle bone disease either, which is a "characteristic X-ray finding."

Dr. Hartman found no evidence of an infectious disease in Peyton, and her liver, kidneys, adrenal glands, lungs and spleen appeared normal. Her heart was slightly enlarged, likely because she was born with a hole between the left and right ventricles. The hole had closed by the time of the autopsy.

Dr. Hartman opined that none of Peyton's injuries were caused by Turner Syndrome,[3] but that her cause of death was cardiac arrest due to blunt force trauma. Dr. Hartman ruled out the possibility that Peyton's injuries were caused by a simple fall, based on the multiple injury sites and the different ages of the injuries.

*4. Brain and Eye Experts*

Peyton's brain was subsequently examined by Dr. Otto Hannes Vogel, a Stanford neuropathologist. Dr. Vogel conducted numerous tests on Peyton's brain and opined that the injuries were highly suggestive of non-accidental head trauma and did not occur from a simple fall. Peyton's eyes were examined by Stanford ophthalmologist Dr. Peter Egbert, who opined that only a "fairly severe accident" could have caused the damage he observed to Peyton's eyes.

*5. Pediatrician*

Dr. Catherine McNinch, Peyton's pediatrician since birth, testified that Peyton was born full term, weighing five pounds, 11 ounces, and her vital signs were normal. Due to an increase in tissue around Peyton's neck and some puffiness to her feet, Dr. McNinch suspected Peyton had Turner Syndrome and ordered a chromosome study. The testing revealed that Peyton did suffer from Turner Syndrome, but no other chromosomal abnormalities were detected. Peyton was discharged from the hospital the day after her birth and Dr. McNinch did not order any special care or medication for her.

---

3        Turner Syndrome is a genetic disorder affecting girls and women.

Peyton was readmitted to the hospital three days after birth with jaundice. While at the hospital, a heart murmur was detected. However, her discharge summary reported her heart to be structurally normal. The findings required follow up but were not considered dangerous. No special care or medication was ordered when Peyton was discharged.

At Peyton's follow-up visit a few days later, Dr. McNinch noted some mild jaundice, but did not hear a heart murmur, and respiration was normal. At the time, Peyton weighed five pounds, 11 ounces. Five days later, Dr. McNinch again saw Peyton. This time, mother and father reported that Peyton was suffering from nasal congestion and was not feeding well. Dr. McNinch did not observe any nasal congestion, only a small amount of inflammatory tissue at the base of the umbilical cord. Peyton weighed five pounds, 10 ounces.

At a well-baby visit 10 days later, Peyton weighed five pounds, 14 ounces, and Dr. McNinch was concerned that Peyton was not gaining enough weight but had no other concerns. The Turner Syndrome diagnosis had nothing to do with inadequate weight gain. At a follow-up exam a week later, Peyton weighed six pounds, two ounces, and Dr. McNinch noted nothing unusual during the exam.

*6. Geneticist*

Dr. Natalie Hauser a medical geneticist, conducted a physical exam on Peyton when she was a month old and did not see any signs of abuse. Dr. Hauser, conducted a chromosome analysis on Peyton and confirmed that she suffered from Turner Syndrome, which meant that the child was missing one X chromosome. As a result, almost all children with Turner Syndrome are unable to reproduce. Dr. Hauser testified that Turner Syndrome is a "mild" condition and may go unnoticed for years if a child does not show outward signs. One of the medical forms mother and father completed indicated that Peyton did not suffer from "easy bruising." Dr. Hauser did not believe the bruising on Peyton's ear at the time of her death was associated with Turner Syndrome. According to

7.

Dr. Hauser, infants with Turner Syndrome do not suffer from decreased bone density or osteopenia.

### 7. *Child Abuse Expert*

Dr. Frederic Bruhn, a pediatrician and child abuse expert, testified that a blood test done on Peyton when she was readmitted to the hospital ruled out the possibility of rickets, a condition that results in the inadequate mineralization of bones. According to Dr. Bruhn, there is no increase in metabolic bone disease in infants with Turner Syndrome. X-rays taken shortly after Peyton's birth showed no bone fractures; X-rays and the CT scan taken shortly after Peyton's death showed multiple fractures in various stages of healing. Fractures were seen on Peyton's right clavicle, right and left humerus, right femur, nine right posterior ribs, and eight left posterior ribs. According to Dr. Bruhn, posterior fractures are "highly correlated with abusive injuries in children." Dr. Bruhn also opined that the number of bruises on Peyton was not indicate of Turner Syndrome and "sends red flags up," as young infants are unable to move around or roll over on their own and therefore have no way of bruising themselves.

Dr. Bruhn opined that the two separate injuries to Peyton's brain could not have been caused by a single fall but were consistent with a severe accident or "abusive head trauma." Dr. Bruhn ruled out any medical condition or vitamin deficiency as the cause of Peyton's injuries. Instead, he opined that the injuries were consistent with "very significant acceleration/deceleration/rotational injuries" caused by shaking. Dr. Bruhn also found it highly significant that Peyton weighed only four pounds four ounces at autopsy and had weighed six pounds two ounces at her last doctor's visit two weeks earlier, indicating that she was not taking in adequate fluid and/or calories prior to her death.

### 8. *Domestic Violence Expert*

Caity Meader, employed as the executive director of Tulare County Family Services, a nonprofit organization serving crime victims, testified as a domestic violence

expert. Meader testified to the various stages of the cycle of violence: (1) the abuser becomes overly sensitive and jealous and starts fights with the victim and the victim attempts to placate the abuser; (2) an acute or crisis incident takes place in which the victim may attempt to fight back; and (3) the abuser apologizes and promises the behavior will not occur again. The victim typically responds well, and the cycle repeats itself. According to Meader, relationships with domestic violence tend to be intense and involve "fast coupling," meaning the couple is usually engaged, married, or expecting a child within six months of starting a relationship, making it easier for the abuser to exert power and control and making it harder for the victim to leave the relationship.

9. *Prior Incidents of Domestic Violence*

a. *Kayla P.*

Kayla P. met and began dating appellant when she was 16 years old; appellant was 19 years old at the time. Four months into the relationship, appellant became "aggressive," "angrier," and "easily set off," directing his anger towards Kayla. Six months into their relationship, Kayla discovered she was pregnant, and appellant told her abortion was not an option.

Appellant became jealous if Kayla talked to other men and, at some point, became abusive. The first time, while in appellant's bedroom, appellant became angry over a partially deleted text message conversation on Kayla's cell phone. Appellant yelled at Kayla, prevented her from leaving the room and backhanded her across the face. Appellant told Kayla it was her fault for making him angry.

When Kayla was six months pregnant, she moved back in with her parents, but visited appellant from time to time. During one visit, appellant was reading through Kayla's text messages and accused her of being a "whore." Kayla tried to leave the room they were in, but appellant grabbed Kayla's arms and shoulder and began shaking her. When he let go, Kayla slapped him on the mouth, causing his lip to bleed. Appellant then threw Kayla on a bed and punched her in the face with a closed fist, causing her lip to

9.

swell. Appellant began to cry and questioned why Kayla had hit him. She felt it was her fault. Kayla later told her mother only that she had hit appellant. She did not want the police involved because appellant was the father of her child.

Kayla gave birth to a daughter, Madison, in August of 2009 with appellant present. When Kayla offered appellant advice on changing Madison's diaper, he became angry and "stormed out of the hospital room." When Madison was three months old, Kayla and Madison moved in with appellant. However, appellant was "[s]hort tempered" and lost his patience anytime Madison cried for more than a minute. Appellant would handle Madison "roughly," "bounce her heavy," and "throw her against his shoulder and pat her really hard" when she was colicky. Appellant was not able to control his temper and became angry anytime Kayla gave him advice. Appellant would get angry when Kayla tried to comfort Madison and would tell Kayla to "tell her to shut up. Tell her to shut the fuck up. Why won't she shut up? Let her cry, then."

Kayla saw appellant shake Madison on a handful of occasions, and he would not listen to Kayla when she asked him to stop. On one occasion when Madison was a few months old, Kayla and appellant were arguing when appellant pinned Kayla to the ground and kept shoving her down when she tried to get up. When she complained that she could not breathe, appellant told her she was being "dramatic." At one point, she was able to get away and ran outside, but appellant followed her and pinned her to the side of the fence. Appellant did not let go until his father came outside.

Kayla moved out of the house when Madison was about five months old but returned when she was about a year old. When Madison got older, appellant would "spank her really hard," and continued to handle her "roughly" when she would become upset or cry. On one occasion, Kayla and appellant were in another argument and Kayla took Madison to a friend's house across the street. Appellant chased after Kayla and when he got to the house, threatened Kayla and tried to pry Madison from Kayla's lap,

10.

smacking her across the fact and telling her he would "fucking break … every single one of your fucking fingers."  Soon after, Kayla and appellant ended their relationship.

Kayla and appellant went to court to establish a custody agreement.  At some point, the agreement allowed supervised visits only for appellant.  Appellant was scheduled to have a visit with Madison two days after Peyton died.  Kayla was reluctant to have Madison visit appellant and his family that day because of Peyton's death.  But appellant texted Kayla, saying it was "not going to be a big bawlfest or anything and [Madison] will be fine."

b.  S.G.

S.G. lived across the street from appellant and dated him, on and off, for six to 10 months.  Prior to dating appellant, S.G. once observed appellant push and hold Kayla up against a fence during an argument.  On one occasion when S.G. and appellant were in S.G.'s bedroom, appellant placed his hand over S.G.'s mouth and nose and asked whether she could still breathe.  When she said she could, he tried choking her again.  This time she said she could not breathe, and he stopped.

On cross-examination, S.G. testified that she believed appellant treated Madison well and "did his best" as a father.  Appellant sometimes brought Madison with him over to S.G.'s house.  On redirect, S.G. testified that, when Madison cried, appellant would get frustrated and yell at her to "[s]hut up, " and then hand Madison to S.G.'s mother.

c.  Victoria and Richard G.

Victoria is S.G.'s sister and also lived across the street from appellant.  On one occasion, Victoria was sleeping in her room, while appellant, Kayla and Victoria's younger brother Richard were hanging out in the living room.  Victoria woke when she heard a scream and a "loud smack."  Richard came into Victoria's room holding Madison, who was a couple of months old.  Victoria went into the living room and told appellant to leave.  He did but returned 30 minutes later.  Appellant and Kayla continued

11.

arguing and appellant tried to get Kayla to leave, but she stayed for a couple of hours until she was able to stop crying and calm down.

Victoria noticed bruises on S.G.'s arms while she was dating appellant. When Victoria asked her about them, S.G. shrugged them off and said it was nothing.

Richard observed appellant and Kayla get into a "screaming match" in Richard's living room. Appellant then smacked Kayla in the face. Madison was either seated next to Kayla on the couch or was in her lap. Either Richard or his sister then took Madison from the living room.

### d. Devyn H.

Devyn H. dated appellant for a little over a year, beginning in 2011. Appellant eventually moved in with Devyn and her mother, Dorothy. Devyn was pregnant at the time, but appellant was not the father. Devyn gave birth to a son, D.M., in May 2011.

At one point, Devyn asked appellant to move out. She then went out with her sister and, when she returned home a couple of hours later, she assumed appellant was no longer there. However, when she went into her bedroom, shut the door, and turned on the light, appellant was sitting on the bed, holding an alcoholic beverage, and his daughter Madison was sleeping on the bed. Appellant became enraged, threw his cell phone at Devyn's face, yelled at her, ripped her shirt, and began slapping her face and head. Madison woke up and began to cry. Appellant told Madison to turn around, lie down, and go back to sleep. When she did not, appellant grabbed Madison by the arm and leg and forcefully placed her face down and continued to yell at her.

At some point during the argument, Devyn was knocked out and lost consciousness and, when she came to, appellant was picking her up by the hair. Devyn suffered a split eyebrow and had "hand marks" from being choked. Devyn's mother called 911 and appellant left. Hours later, Devyn went to the police station and filed a report and requested a restraining order.

A few weeks after the incident, Devyn was a passenger in appellant's car when it was stopped by police. There was a restraining order in place and appellant was arrested. Devyn testified that she had two black eyes at the time but acknowledged this was not noted in the police report. According to Devyn, she chased away a defense investigator with an AR-15 when he repeatedly showed up at her house after she had told him she did not want to speak with him. Her dog also chased after the investigator.

### e. Dorothy H.

Devyn's mother, Dorothy, testified that appellant lived with her and Devyn for about six months when Devyn's son D.M. was about three months old. One night, Dorothy heard D.M. crying and went into Devyn and appellant's bedroom and saw that D.M. had a blanket completely covering his face and head. Appellant told Dorothy that he put the blanket there because he had done so with his own daughter to put her to sleep. Dorothy took D.M. into her own bedroom.

About two or three nights later, Dorothy heard what sounded like someone hitting the wall in Devyn and appellant's bedroom. Dorothy entered the room and saw appellant pinning Devyn against the wall "pretty hard." Dorothy told appellant to let her go and Devyn ran out of the room. Appellant followed Devyn and told her to get back into the room. Following a back and forth, in which Dorothy insisted that Devyn was not going to return to the room and appellant insisted that she would, Dorothy told appellant to leave, or she would call the police. Officers arrived and told appellant to leave.

On one occasion, appellant brought Madison over to the house and Dorothy observed appellant give Madison "a really hard spanking," holding Madison's hands with one of his hands and using the other hand to spank her hard enough to lift her feet off the floor. When Madison cried, appellant told her to be quiet and that she would have to sit on the couch for three hours. When Dorothy protested, appellant told her Madison was his child and he could do what he pleased. Appellant eventually left and Dorothy called Kayla and told her to pick up her daughter.

13.

#### f. Melinda W.

Melinda dated appellant for about two years while both were in high school. On one occasion, while the two were in appellant's bedroom, they got into an argument and appellant would not allow Melinda to leave the room. Appellant slapped Melinda across the face, threw her on the bed, and choked her. Appellant let go just before Melinda felt like she was about to pass out. Appellant then sat on the bed and cried and apologized. Melinda told appellant it was partially her fault for arguing with him. On another occasion, the two were arguing and appellant punched a hole in the wall next to Melinda.

#### g. Aubrey H.

Aubrey H. dated appellant for six months in 2007 and 2008. On one occasion, appellant came to her house to give her a ride to school. He was angry when he arrived and the two began arguing. Appellant hit Aubrey on the head with a bag containing some items. When Aubrey grabbed her head and began to cry, appellant grabbed Aubrey by the throat and pushed her against the wall. Aubrey could not breathe. Eventually appellant let go. Aubrey never told her parents or sibling about the incident.

### 10. Courtney J., Peyton's Mother

Courtney and appellant met in February 2011.[4] The two were together for a few months before breaking up. A few months later, they were back together, and appellant moved into Courtney's duplex. After appellant moved in, they got a pit bull.

Courtney worked full time while appellant worked through a temp agency once or twice but spent the majority of his time sleeping and playing video games. Appellant left

---

**4** At trial, Courtney described appellant as her "ex-husband." Courtney was originally charged with child abuse (Pen. Code, § 273a, subd. (a)), with the special allegation of willfully permitting a child to suffer great bodily injury or death (Pen. Code, § 12022.95). Prior to trial, Courtney agreed to plead guilty to failing to protect Peyton and agreed to testify against appellant in exchange for release from jail. Sentencing for Courtney was postponed until after appellant's trial.

almost every night, taking Courtney's car and saying he was "out fishing," although he never brought home any fish.

Appellant's daughter, Madison, was about one or two years old at the time and, before appellant's visits with Madison were required to be supervised, Madison came over to the house one or two days a week. At some point, appellant was required to attend anger management classes due to charges of domestic violence against a former girlfriend. This did not concern Courtney, who believed it was just part of the "court process."

Courtney's family did not like appellant and, as a result, Courtney saw less of them. After an initial miscarriage, Courtney became pregnant with Peyton and carried the baby to full term.

Courtney described appellant as controlling, keeping her from her own family and friends. Appellant did not like the way Courtney dressed, questioning who she dressed up for. On one occasion, Courtney went with appellant to a bar and then to one of appellant's cousin's house with appellant's father and girlfriend. When Courtney was ready to leave, she went out to the car and put the keys in the ignition. Appellant came to the driver's door, opened it, took the keys from Courtney, hit her and yelled at her until someone came outside and pulled appellant away.

During their relationship, appellant would take Courtney's cell phone and keys so she could not leave the apartment. He held her down and put his hand over her mouth, so the neighbors could not hear her. During one argument, appellant punched a hole in the bedroom door after Courtney locked herself inside. Courtney did not tell her family about appellant's behavior.

Following Peyton's birth, Courtney and appellant took turns caring for her during the day and night. Appellant usually fed and bathed Peyton and changed her diaper. When Courtney was not working, she and appellant both cared for Peyton at night; when Courtney was working, appellant would be up with Peyton at night. Courtney was not

concerned about Peyton's Turner Syndrome diagnosis and Peyton was not a "sickly" child but was "fussy".

The day Courtney returned to work after maternity leave, she got up and left for work at about 5:30 or 6:00 a.m. Before she left, Courtney told appellant to tell her when Peyton was awake and let her know how much she was eating. Appellant later sent Courtney a text that the dog, "made him fall with Peyton" but that Peyton was fine, only "cried a little" and she "has a couple of little bruises on her cheek and chin." Courtney was in a meeting at the time but went home for lunch. While Peyton had a few bruises on the left side of her cheek and chin, she seemed fine.

Several days later, Courtney returned home from work and that evening went to bed around 9:30 p.m. Appellant was in the kitchen feeding Peyton, who had a lot of phlegm and was being "fussy." Appellant woke Courtney at 11:00 p.m. and told her they needed to call 911 because Peyton was not breathing. Courtney went into Peyton's room, where she found the child on the floor lying on her back. After the 911 operators instructed him to do so, appellant began performing CPR on Peyton. An ambulance arrived and Courtney accompanied Peyton to the hospital. At the hospital, appellant told Courtney he had checked on Peyton once and she was fine; the next time he checked, she was pale and not breathing.

Courtney and appellant got home from the hospital around 2:00 or 3:00 a.m. and Courtney informed her family, via text message, of Peyton's death. The following night, Courtney woke to find appellant gone. She texted him and asked that he return home, but he did not come home until later that morning, saying he had been at the dog park with the dog. Courtney discovered that he had actually been out partying with friends.

Later Courtney and appellant got into an argument because appellant did not want to go with Courtney to make funeral arrangements. Appellant did not like it that Courtney's grandparents would be there as well. When Courtney tried to leave without

16.

appellant, he pinned her down on the couch and covered her mouth when she yelled. He eventually let go and the two went to the funeral home.

When Courtney initially spoke to detectives, she was not honest about her relationship with appellant, not wanting to believe that he could have hurt their child. After their arrest, Courtney and appellant exchanged letters in which appellant insisted that his family loved Courtney, that her family did not and was trying to control her, and that the two of them should have another child.

Courtney told investigators that, at one point before Peyton's death, appellant was holding Peyton after she had had a bath. Courtney asked to take Peyton so she could dry her off, but appellant refused to give her the child.

*11. Courtney's Family Members*

Courtney's maternal grandmother testified that Courtney and appellant came to visit her every week or two. When maternal grandmother would ask Courtney a question, appellant would often answer for Courtney.

Courtney's older sister, Nicole, testified that, prior to dating appellant, Courtney was very outgoing and well dressed. For a while, Nicole and Courtney worked together at an insurance office. After meeting appellant, Nicole described Courtney as increasingly less dressed up and quieter, and Courtney began spending much less time with Nicole and Nicole's children.

Nicole never saw appellant hit Courtney, but she did notice finger-shaped bruises on Courtney's arms. When she asked about them, Courtney would say she was "just clumsy."

Courtney's paternal grandmother testified that Courtney did not dress as well and did not seem as concerned about her appearance after she met appellant.

*12. WIC Dietician*

Later in the day after appellant supposedly fell with Peyton, appellant, Courtney and Peyton went to the local WIC office to get food vouchers. Neither Courtney nor

17.

appellant mentioned the fall to the WIC employee. Cynthia Hilton, the WIC employee who met with appellant, Courtney and Peyton, testified that appellant and Courtney "refused" to have Peyton weighed that day, which she usually does and records. Had they told her of the fall, Hilton, a mandatory reporter, would have noted it.

### 13. *Johnny Berumen, Friend of Appellant's*

Johnny Berumen had been appellant's best friend since childhood. Appellant came to Berumen's house the night after Peyton died. The two, along with about five other friends, talked, drank beer, and listened to music; appellant did not discuss Peyton's death with Berumen.

Berumen spoke to Detective Smythe after Peyton's death and acknowledged that he "possibly" told Smythe that appellant had a quick temper. Berumen acknowledged telling Smythe that he had seen appellant throw Kayla against a wall. He denied having told Smythe that he had witnessed appellant assault Devyn or other women.

Detective Smythe testified that Berumen told him they drank beer, watched movies, and played pool at Berumen's house after Peyton died. Berumen also told him he had seen appellant "snap" at Madison and seen Kayla and appellant get physical and that appellant was the aggressor.

## B. DEFENSE

### 1. *Officer Jose Esparza*

Officer Jose Esparza testified that he was present when appellant was pulled over in 2001. At the time, there was a "confidential victim" in the vehicle, but he did not note any apparent injuries on the victim's face in his report. Had he seen that the victim had two black eyes, he would have included that information in his report.

## 2. *Defense Investigator Jake Torrance*

Defense Investigator Jake Torrance testified that he attempted to contact Devyn on two occasions. On neither occasion was he chased off her property by a person carrying an AR-15, nor was he ever chased or bitten by her dog.

## 3. *Peyton's Pediatrician*

According to Dr. McNinch, Peyton was delivered two weeks prior to her due date, but was still considered full term. During a visit when Peyton was a week old, Dr. McNinch noted that Peyton "does not feed well when nose is stuffy, but her nose is stuffy late at night and in the morning." The notes also stated that Peyton had an "[o]ccasional cough."

## 4. *Appellant's Neighbors*

Neighbor Candido Perez testified that, when he was contacted on the night Peyton died, he told the officer that it had been quiet and he had not heard any arguing. He did acknowledge that he had a house full of kids, which made it difficult to hear anything next door.

Neighbor Kelly Moreno testified that she never heard any concerning sounds or painful cries coming from appellant and Courtney's apartment.

## 5. *District Attorney Investigator Mark Lopez*

Investigator Mark Lopez participated in a "free talk" with Courtney in which her defense attorney and the prosecutor were also present. An audio of the interview was played for the jury and transcripts provided. During the interview, Courtney stated that she decided to cooperate with the prosecution after hearing the extent of Peyton's injuries at the preliminary hearing.

During the interview, Courtney stated that appellant would sometimes become frustrated while feeding Peyton and shake her, although not vigorously, to get her to eat. He also often rubbed her ear, which might have been painful, to wake her up to feed her.

### 6. *Appellant's Friends and Family*

Holly Bennett testified that she had known appellant since grade school. They had a romantic relationship for a while, but when the relationship ended, they remained friends. Holly saw appellant around his daughter Madison on a handful of occasions when she was a baby and thought he treated her well. Holly testified that her brother, Johnny Berumen, had a reputation for lying.

Crystal Ward testified that she had known appellant since childhood. Ward visited appellant and Courtney at their place when Peyton was about three or four weeks old. Ward observed appellant treating Peyton in a tender, gentle and nurturing manner, and appellant fed Peyton while she was there.

Elizabeth Ormonde testified that she was friends with appellant's parents and had known appellant since 2002. Ormonde had observed appellant play with her own two-year-old son and daughter when she was younger and never observed anything that caused her to be concerned about how appellant was treating her children. Ormonde had also observed appellant interact with his daughter Madison. He appeared to be a loving father, and Madison was always happy and excited to see appellant.

Samantha Vargas grew up with appellant and the two were close friends. Appellant came by when Vargas's son was born and showed her how to swaddle him and support his head when she was holding him. Vargas observed appellant with Madison, who appeared happy. After Peyton was born, appellant came over to Vargas's home two to three times a week, both during the day and at night. Vargas saw appellant with Peyton on one occasion, in which appellant appeared to be a proud father, showing her off.

Vargas' mother Tammi testified that appellant and her daughter were best friends, and it was not unusual for appellant to come over to their house.

Appellant's cousin, Stephen Holdridge, saw appellant, Courtney and Peyton together on one occasion in late 2012. Appellant appeared happy and introduced Peyton

20.

to Holdridge's family. Peyton was wrapped in a blanket and Holdridge only saw her face.

Appellant's aunt, Teresa Avila, testified that her son was the same age as appellant, and they attended school together. Avila saw appellant with Madison at family gatherings. Appellant appeared to be a good father and Avila never saw appellant mistreat Madison. Avila saw appellant with Peyton on two occasions. Appellant was holding Peyton, feeding her and showing her off. Courtney, who was also there, appeared nervous and did not look happy. Avila thought Peyton looked "very small" and "very fragile" and did not appear healthy. On the two occasions Avila saw Peyton, her eyes were closed and her eyelids red and puffy. Avila saw Peyton at the family reunion a week before she died. She looked "frail" at the time.

Avila's son Eric testified that appellant seemed very excited about having Peyton and, on the two occasions he saw Peyton, appellant appeared to be a caring father.

Appellant's father, Doug Rowe, testified that he and appellant were very close, and it was not unusual for them to go fishing at night. According to Doug, appellant seemed very happy after Peyton was born. Doug saw Peyton two or three times a week and never saw any bruising or swelling on her arms. She slept constantly and only cried when woken to be fed. Doug saw Peyton at the family reunion the week before she died, and he did not notice anything concerning about her.

Doug recalled one occasion when he was fishing with appellant and Courtney called to say that Peyton would not eat. When they returned, Courtney handed Peyton to appellant and said, "Here, I can't do anything with her." Appellant took Peyton and fed her. Doug was also around appellant and Madison on many occasions, and he never saw appellant mistreat Madison.

Appellant's mother, Tina Rowe, testified that appellant treated Madison well. Tina saw Peyton on two occasions, when she was two weeks and four weeks old. She thought Peyton looked "a little bit sickly."

21.

Jerry Haley testified that he was friends with appellant's older brother. Appellant invited Haley over to see Peyton on one or two occasions, but Haley stayed only five or 10 minutes. Appellant told Haley that Peyton had health issues and he needed to be there for her.

Sammy Martinez testified that appellant was the uncle of his autistic grandson, Sabien, who was hyperactive. Appellant would run around with the child to tire him out. Appellant never mistreated the child.

Appellant's grandmother, Daisy Rowe, was around Madison for several hours at least twice a week in 2012 when appellant came to her house for supervised visits. Appellant treated Madison well and sometimes brought Peyton along. Daisy saw appellant change Peyton's diapers and never noticed any signs of abuse on her arms or legs. The only concern was getting Peyton to eat. According to Daisy, Courtney did not seem as interested in taking care of Peyton as appellant was.

Daisy also saw Peyton at the family reunion a week before her death and did not see anything concerning about her body or how appellant was treating her. Peyton's eyes were hardly open when Daisy saw her. Daisy described appellant as very sad after Peyton's death.

Jack Armstrong testified that he had been friends with appellant for over 10 years and called him the day after Peyton's death. Armstrong asked if appellant wanted to grab a beer or hang out. Appellant sounded as if he had been crying. Appellant picked up Armstrong and they went to Berumen's house. Appellant was not joking as he usually did and was crying at one point. Armstrong did not talk to appellant about Peyton's death, but at one point, he overheard appellant say he and Courtney would try to have another child.

Ryan Martindale testified that he and appellant had been friends since high school. On one occasion he and appellant were fishing at night and Courtney came to pick up

appellant at 11:00 or 11:30 p.m. Martindale observed appellant with Madison and thought he was a doting father.

Appellant's second cousin, Jamie Percival, visited appellant, Courtney and Peyton shortly after Peyton's birth. Appellant appeared to be very caring, and Percival had no concerns about Peyton's safety.

Appellant's great aunt, Frances Tuggle, was present during the family reunion in 2012. Tuggle held Peyton for at least an hour at the reunion and also fed her a bottle. Tuggle thought Peyton looked "pale" and "lethargic" and had a hard time drinking from her bottle. Tuggle observed Peyton when her diaper was being changed. Tuggle, a mandatory reporter, did not notice any signs of physical abuse on Peyton.

Appellant's second cousin, Debra Sanchez, was also at the family reunion and saw Peyton there. Sanchez thought it was odd that Peyton was wrapped in a blanket because it was a warm day.

Appellant's great aunt, Beatrice McCarty, who was at the reunion, held Peyton "for quite a while." McCarty thought Peyton looked lethargic and had a very weak cry. She unwrapped Peyton from her blanket, checked her toes and fingers, and changed her diaper. McCarty, a mandated reporter, did not observe anything concerning Peyton's arms or legs. Appellant appeared to be an attentive and proud father.

Appellant's cousin, Collin Rowe, testified that appellant came over to his house once or twice a week and appellant was "obsessed" with Peyton. Collin never observed appellant mistreat Peyton, and he never noticed anything concerning. Peyton was a very quiet baby.

Appellant's aunt, Florence Rowe, visited Peyton at the hospital the day she was born. Courtney and appellant stopped by her place once or twice a week after that. During these visits, appellant usually changed Peyton's diaper. Florence never noticed anything concerning about Peyton although she was very quiet and appeared lethargic.

23.

Appellant treated both Peyton and Madison very well, and he appeared to be a wonderful father. She had no concerns that Peyton was being abused.

Appellant's cousin, Kendahl Rowe, testified that she saw Peyton once or twice a week. Kendahl observed appellant change Peyton's diaper, and she never noticed any bruising or marks on her body. She also never saw appellant mistreat or become impatient with Madison during appellant's supervised visits, which she was present for.

Kendahl testified that she was friends with Kayla until Kayla began acting differently. On one occasion, Kayla became upset with appellant after he wanted to check on Madison while she was sleeping. An argument ensued, and Kayla threw herself against a fence in the backyard and began yelling.

Devyn's cousin, Heather Creech, testified that she had known appellant since elementary school. According to Creech, Devyn told her that she wanted to end her relationship with appellant, but did not know how to tell him, so she falsely accused him of pushing her and shaking her baby.

Melinda Jones dated appellant for five or six months in 2008 and observed him interact with her nephew, Sabian. Jones thought appellant treated Sabian very well. At some point during their relationship, appellant became jealous of another man who was interested in Jones and, on one occasion, began looking through Jones' cell phone. Jones broke up with appellant after he began cheating on her with Kayla.

Nicole Ashford testified that Courtney texted her after Peyton was born to say that Peyton did not seem to like her breastmilk, as she was having trouble latching, feeding only briefly and crying. A switch to bottle feeding did not seem to help.

*7. Appellant's Teacher*

One of appellant's high school teachers, David Mayhew, testified that, while appellant was in high school in 2006, appellant helped a fellow student who was having a seizure in class. Appellant moved the surrounding desks away from the student, placed something underneath her head, and comforted her.

24.

*8. Turner Syndrome Expert*

Dr. Karen Klein, a pediatric endocrinologist, testified as an expert in Turner's Syndrome. Dr. Klein testified that Peyton's blood test revealed a karyotype of "45, X.," meaning that Peyton was missing one of her X chromosomes, considered to be the "most severe" form of Turner Syndrome. Common complications associated with Turner Syndrome include short stature, webbing of the neck, a shield chest, widely placed nipples, and severe heart disease. Lymphedema of the hands, feet, and sometimes the ears occurs. Those with Turner Syndrome can also suffer from kidney problems, thyroid problems, lack of ovarian function, hearing loss, and a high arched pallet. If a baby is born with "enough" lymphedema, Dr. Klein instructs families to massage the baby's hands and feet to reduce swelling. According to Dr. Klein, half of girls with Turner Syndrome are born with life-threatening cardiac disease and require immediate medical attention.

Dr. Klein testified that the fact that Peyton's cardiologist wanted to see her back in three weeks after birth indicated that the doctor wanted to ensure that the hole in Peyton's heart was closing. Many babies who die during infancy die due to heart disease in Turner Syndrome. There is also a higher rate of sudden infant death with Turner Syndrome unrelated to heart disease.

Dr. Klein testified that children with Turner Syndrome have difficulty with feeding because they generally have a high arched pallet and a smaller chin. Dr. Klein opined that Peyton's recorded weight loss indicated she was failing to thrive, and an infant who is failing to thrive may have vitamin and mineral deficiencies that could affect bone health. Dr. Klein acknowledged that injuries could also be a reason why an infant is failing to thrive.

*9. Neuropathology Expert*

Dr. Jan Leetsma, a neuropathology expert, acknowledged that he had minimal experience conducting autopsies or treating live patients. Dr. Leetsma disagreed with Dr.

Hartman's conclusion that Peyton went into cardiac arrest within minutes of suffering blunt force trauma because even severe brain injuries do not usually result in immediate death.

Dr. Leetsma opined that sawing into a bone sample was an imprecise method of determining vitamin D or other mineralization deficiency. According to Dr. Leetsma, infants born with vitamin D deficiency often sustain fractures during birth or in utero, even though they may not exhibit outward signs of pain. He also testified that an infant who is not receiving adequate nutrition could be deficient in vitamins, leading to bone weakness; that dramatic weight loss could be the result of dehydration; and that bruises on infants may occur after death from minor manipulation due to a shortage of clotting factors.

Dr. Leetsma examined the slides of Peyton's heart taken during autopsy and found "quite a lot of deformity in the way the fibers were distributed in the slide." Dr. Leetsma suspected there was a disease of the heart muscle but acknowledged that he was not a cardiac pathologist.

Dr. Leetsma examined photographs of Peyton's brain but could not be certain there was an actual injury of the corpus callosum, because handling and removing the brain itself could cause damage. Dr. Leetsma did not believe shaking an infant could cause injury to the corpus callosum and it was not possible to determine whether a particular axonal injury was caused by traumatic injury or inadequate oxygen or poor blood perfusion.

Dr. Leetsma opined that Peyton's subdural hematoma appeared to be recent or acute and the best way to date it is through microscopic examination. Slides of the surface of Peyton's brain showed evidence of a repair reaction that had been present for a week or more.

Dr. Leetsma testified that a child might not immediately show signs and symptoms when they sustain a subdural hematoma. While the leading cause of subdural hematomas

26.

is trauma, it can also be caused by bleeding disorders.  Dr. Leetsma did not rule out the possibility that the alleged fall days before Peyton's death caused the subdural hematoma.  Dr. Leetsma testified that bleeding in the optic nerve sheath is not diagnostic of trauma or shaking but could have resulted from increased intracranial pressure.

Dr. Leetsma noted two areas of subgaleae hemorrhaging between Peyton's scalp and skull.  According to Dr. Leetsma, one in the right temple appeared to be a needle puncture site where an attempt was made to reach a scalp vein to provide fluid, although Dr. Leetsma was not sure whether the needle marks were the cause of the subgaleae hemorrhage.  Dr. Leetsma noted another impact site but testified that it could also have been caused by handling during medical treatment.  According to Dr. Leetsma, the primary cause of Peyton's death was the subdural hematoma, and the slide of the blood cells in the brain tissue indicated that the blood had been there four or five days before death.

Dr. Leetsma testified that a fall from four feet above ground could have caused the subdural hematoma.  Dr. Leetsma did not believe that shaken baby syndrome actually exists.

10. *Child Abuse and Bone Science Expert*

Pediatrician Dr. Charles Hyman testified as an expert in child abuse and bone science, although he acknowledged that he had not received any formal training in either field.  Dr. Hyman agreed that bruises on Peyton's cheek, ear, and thigh were suspicious, but that the finger-shaped bruises on Peyton's face could have been from appellant holding Peyton tighter during the alleged fall.

Dr. Hyman reviewed the CT report and testified that it was not possible to accurately date a fracture.  Dr. Hyman did not agree with the report indicating Peyton's rib fractures were 14 days old but were likely many weeks old.  Dr. Hyman testified that recent medical literature suggests that rib fractures were not always indicative of child abuse.

Dr. Hyman opined that the larger than normal soft spot, or fontanelle, on the top of Peyton's skull, indicated a lack of ideal bone mineralization, as did the "cupping and flaring" in Peyton's ribs.

Dr. Hyman testified that birth-related clavicle fractures can be asymptomatic and easily undiagnosed. And he opined that the bone callous on Peyton's right clavicle and left femur were more than 14 days old, and there was no way to tell whether the fractures were inflicted intentionally or were accidental.

Dr. Hyman did not think Dr. Hartman's method of sawing into and cutting pieces of bone was generally accepted as a way of determining fragility, as bone fragility can exist in normally calcified bones. According to Dr. Hyman, he himself had twice accidentally fractured the femur of a newborn in intensive care while conducting a routine check for hip dysplasia.

Dr. Hyman opined that postmortem fractures on Peyton's femur could have been caused by the medical staff during treatment and the number of rib fractures together with a lack of other injury associated with high-force intrathoracic injury indicated that Peyton suffered from bone fragility. Dr. Hyman did not think there was any way to tell whether Peyton's rib fractures were caused by abuse or bone fragility and normal handling, although he acknowledged that it was possible to squeeze a child hard enough to break a rib and not leave a bruise. According to Dr. Hyman, 80 percent of rib fractures in children with bone fragility are clinically silent, meaning caretakers and doctors are not aware of them, and he opined that Peyton's bone fractures were consistent with having bone fragility.

C. PROSECUTION'S REBUTTAL

   1. *Pediatric Orthopedic Surgeon*

Dr. Joseph Gerardi, the medical director of orthopedic surgery at Valley Children's Hospital, testified that an X-ray of Peyton's chest, taken three days after birth,

28.

showed no fractures. The X-rays taken after Peyton's death showed fractures in the right humerus and thigh bone that had no healing response, indicating that they were recent. The X-rays also showed a normal healing response to the collarbone, left humerus, left femur, and multiple ribs.

Dr. Gerardi testified that he had " a huge amount" of experience with tens of thousands of patients who return for evaluation after initial injury and, as a result, he is able to determine the approximate age of a healing fracture. He estimated that the fractures of Peyton's left side occurred one or two weeks before the X-rays after death were taken, and the fractures on her right side within a day or two before the X-rays were taken.

Dr. Gerardo testified that squeezing a baby around the chest could fracture the baby's posterior ribs. He disagreed with Dr. Hyman's testimony that callous formation on Peyton's fractures was not normal. Instead, Dr. Gerardi opined that the healing response was exactly what you would expect in a young infant about two weeks after injury.

Dr. Gerardi's clinic currently had 275 active OI[5] cases and that X-rays of persons with OI look different than X-rays of persons without the disease. The bones of persons with OI fracture in different patterns. Dr. Hyman also did not agree that Peyton could have suffered from rickets, as rickets was "very, very easy" to diagnose based on abnormal growth plates, which Peyton did not have. Dr. Girardi disagreed with Dr. Leetsma's opinion that the hemorrhage around Peyton's right femur might be related to the insertion of an IV needle or that the needle would break Peyton's thigh bone.

According to Dr. Gerardi, Peyton had normal bone health. He opined that Peyton had two episodes of trauma: one that occurred one or two weeks before her death, the

---

[5]     Osteogenesis Imperfecta is a genetic bone disease present at birth, also known as brittle bone disease.

29.

other right before she died.  He did not believe any of the injuries were caused by the treating doctors or medical team.

### 2. *Testimony of Shannon Nichols*

Shannon Nichols and Berumen share two children.  On one occasion, Berumen's sister, Holly, came into the room crying and told Nichols that appellant had just choked her after an argument.  Holly's neck was red.

## D. DEFENSE REBUTTAL

Holly returned to the stand to testify that appellant never choked her.  According to Holly, she once went into Nichols' room crying and told Nichols that appellant had hit her, although he had not.  According to Holly, she threatened to hit appellant, he said "Go for it", she swung at him, and he grabbed her hand and made her slap herself.  She got mad at herself, began crying, and ran into the room where Nichols was.

## DISCUSSION

## A. DID THE TRIAL COURT ABUSE ITS DISCRETION IN ALLOWING MEDICAL EXPERTS TO TESTIFY THAT THE INFANT'S INJURIES WERE NONACCIDENTAL AND TRAUMATIC IN NATURE?

Appellant first contends that the trial court abused its discretion in allowing the prosecution's medical experts to testify that Peyton's injuries were nonaccidental and were the result of inflicted trauma, abusive head trauma, and child abuse.  We find no prejudicial error.

### 1. *Background*

Prior to trial, defense counsel moved in limine to exclude or limit medical opinion testimony regarding the cause of Peyton's injuries and the manner in which they were inflicted.  Counsel requested that the trial court exclude "any testimony that calls for a legal opinion or conclusion (e.g., '*abusive* head trauma,' '*non-accidental* injury,' 'child abuse,' 'abusive,' 'nonaccidental,' 'reckless,' 'negligent')."  The prosecutor opposed the

motion, arguing that terms such as "child abuse" and "nonaccidental" trauma are commonly used medical terms and that such evidence was admissible under section 801.

The trial court ruled that "nonaccidental" is "a medical term that these experts use, and I would allow that." The trial court also allowed use of the term "nonaccidental blunt force trauma," but stated that the experts should avoid using the term "child abuse" as a diagnosis.

At trial, Dr. Vogel, the director of neuropathology at Stanford, testified that he examined Peyton's brain and found her injuries highly suggestive of "inflicted trauma," meaning "not the kind of trauma that occurs to the brain with a simple fall or something of that sort."

Dr. Hartman, a certified forensic pathologist, conducted Peyton's autopsy and testified that Peyton died as a result of cardiac arrest due to blunt force trauma. Dr. Hartman testified that he did not know exactly how Peyton died, as he was not present at the time, but that, based on his training and experience, Peyton's posterior rib fractures were not seen with resuscitation efforts, but were seen with "child abuse."

Pediatrician Dr. Bruhn testified as an expert in child abuse, having treated over 1,000 children who had been physically abused. According to Dr. Bruhn, posterior rib fractures are "rarely seen and they're highly correlated with abusive injuries in children." While Dr. Bruhn testified that such injuries could occur in other ways, the number of fractures "suggest abusive injury." Dr. Bruhn opined that Peyton's injuries were caused by abusive trauma based on the constellation of injuries and the reported history of a single fall. Dr. Bruhn testified that Peyton's injuries could not have been caused by a single fall days prior to her death and, ruling out other possible causes of death, left "abusive head trauma." According to Dr. Bruhn, the American Academy of Pediatrics recommends using the term "abusive head trauma" rather than "shaken baby syndrome." While Dr. Bruhn testified that he believed Peyton's injuries could have been caused by shaking, he could not say definitively as he was not present when she died.

*2. Relevant Law*

"Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (§ 805.)  However, to be admissible, the opinion must be "sufficiently beyond common experience that … [it] would assist the trier of fact." (§ 801, subd. (a).)  " '[T]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that [people] of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.)

"The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well-equipped as the expert to discern whether a witness is being truthful." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.)  However, an expert may, relying on reference to their expert knowledge, identify facts or aspects of behavior that are inconsistent with claims presented at trial.  (*Ibid.*)

*3. Standard of Review*

"A trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion." (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

*4. Analysis*

Appellant's argument is that, because the only issue at trial was whether Peyton's injuries were accidental or not, no expert opinion was needed.  As argued by appellant, the inferences and conclusions drawn from the medical examination "could be just as easily made (or rejected) by jurors evaluating witness credibility and the circumstantial evidence."  And because the experts testified that Peyton's death was due to inflicted

abuse and not an accident, appellant argues the experts violated the principle that a witness may not express an opinion as to whether a crime has been committed.

Upon review of the record here, we do not agree with appellant's position. A review of the trial court's statements shows that the questioned language was generally permissible because it constituted a legitimate medical diagnosis. The prosecution's experts testimony generally discussed the use of the debated terms in a diagnostic sense based on a comparison of the injury with the purported mechanics alleged to have caused it.

On this record, we see no basis for appellant's argument that this testimony was not beyond a juror's understanding, an assessment of appellant's guilt, or an assessment of appellant's credibility. The diagnostic nature of the term demonstrates that the doctors were not providing a legal opinion on whether the injury was, in fact, intentionally caused but, rather, that the doctors were able to make certain medical deductions based on the nature of the injury and the mechanism of harm presented to them. Not only is this a factual opinion, but it is certainly one that goes beyond the general understanding of a lay juror.

Further, that appellant's defense raised issues of accidental injury does not preclude the introduction of the opinion. As noted above, an opinion is not improper merely because it goes to an ultimate issue of fact. Here, while appellant's actions and purported intent may have been a critical point of dispute, that dispute did not preclude a general medical opinion applying the purported facts to the injury identified and concluding the diagnosis satisfied the term nonaccidental injury. For similar reasons, the fact that the opinion conflicted with appellant's defense or appellant's testimony does not modify the opinion to a statement on appellant's guilt or credibility. Rather, it remains a credible medical opinion that creates a conflict the jury must resolve.

We reject appellant's claim to the contrary.

B.  DID ADMISSION OF EVIDENCE OF UNCHARGED ACTS OF DOMESTIC VIOLENCE VIOLATE APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL?

Appellant next argues that evidence of the prior uncharged acts of domestic violence should not have been admitted under section 1109.  Appellant challenges the constitutionality of section 1109, but acknowledges the constitutionality of "a sister statute, section 1108," and therefore wishes to preserve the issue for further review.  He further argues that the trial court abused its discretion in admitting the evidence under section 352.  We conclude that the trial court did not err when it admitted evidence of the uncharged acts.

### 1.  Background

Prior to trial, defense counsel moved to exclude appellant's uncharged acts of domestic abuse on Courtney and a host of former girlfriends, which might be offered pursuant to section 1109.  The prosecution filed an opposition to the motion, arguing that appellant's prior acts of domestic violence were admissible under sections 1109 and 1101, subdivision (b).

During a hearing on the motion, the trial court and parties discussed the testimony of each of the potential witnesses individually.  The trial court ruled that the prosecutor could introduce evidence of appellant slapping Courtney when he took her keys; the evidence of the altercation involving funeral arrangements; and the testimony of Courtney's sister, who observed bruising on Courtney's arms while in a relationship with appellant.  The trial court excluded evidence that Courtney's sister had warned Courtney not to date appellant because he had a reputation for physically abusing his ex-girlfriends.

As to Devyn, the trial court allowed evidence appellant physically assaulted her while they were dating after she told him to move out and that appellant subsequently violated a restraining order.  It excluded evidence that appellant pressured Devyn into having sex; that appellant cheated on Devyn with Courtney; or that Devyn's C-section incision had been injured during an assault by appellant.

The trial court allowed evidence in which appellant held his hand over S.G.'s mouth. In making this ruling, the trial court stated,

> "As to the others that we have already mentioned that I've allowed in particular incidents, I believe there is sufficient probative value, that being the force and violence used in those cases, and the force and violence allegedly used against the victim in this case."

The trial court further found that the evidence would not confuse the issues or constitute an undue consumption of time. The trial court excluded evidence that appellant drove S.G. to a remote location, threw her cell phone into a cornfield, and told her that no one would hear her if she tried to run. It also excluded evidence that appellant broke three of S.G.'s cell phones over a six-month period.

The trial court allowed evidence of various incidents of physical abuse by appellant on Kayla but did not allow her to testify that she suffered from random blackouts, migraines, and wrist pain after the physical abuse.

As to Aubrey, the trial court allowed evidence that appellant hit her over the head with a bag containing a heavy item and then choked her against a wall. But it excluded evidence of an incident in which appellant was arrested after he punched Aubrey in the face and threatened to get a gun and kill several people, including himself.

And, as to Melinda, the trial court allowed evidence of an incident in which appellant straddled Melinda's chest and began choking her in his room, as well as evidence that appellant punched a hole in his wall during an argument with Melinda.

*2.  Standard of Review*

We review appellant's claim that section 1109 is unconstitutional and violates principles of due process de novo. (*People v. Scott* (2016) 3 Cal.App.5th 1265, 1271.) We review a trial court's ruling regarding evidence of a criminal defendant's uncharged crimes for abuse of discretion. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531.)

### 3. *Constitutionality of Section 1109*

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159; § 1101, subd. (a).) However, the Legislature has created certain exceptions to the prohibition against admitting propensity evidence in cases involving sexual offenses (§ 1108, subd. (a)) and domestic violence, elder or dependent abuse, or child abuse (§ 1109, subd. (a)(1)-(3)).

Appellant acknowledges that the California Supreme Court rejected the argument that section 1108 violates a defendant's right to due process in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*).[6] *Falsetta* held that "the trial court's discretion to exclude propensity evidence under section 352 saves section 1108 from [a] due process challenge." (*Id.* at p. 917.) Although the California Supreme Court has not specifically ruled on the constitutionality of section 1109, which is a parallel provision to section 1108, Courts of Appeal have consistently concluded that section 1109 does not violate principles of due process under the reasoning in *Falsetta.* (See, e.g., *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024; *People v. Johnson* (2000) 77 Cal.App.4th 410, 420.)

We are bound by the Supreme Court's decision in *Falsetta* and find that *Falsetta*'s analysis applies to section 1109 and reject appellant's due process claim. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450; *People v. Hoover, supra,* 77 Cal.App.4th at p. 1024.)

### 4. *Admissibility of Uncharged Acts Under Section 352*

As noted above, absent an exception, character evidence, including evidence of specific instances of conduct, generally is inadmissible to prove conduct on a specified

---

[6] The California Supreme Court recently declined to revisit *Falsetta* in *People v. Baker* (2021) 10 Cal.5th 1044, 1089-1090 (*Baker*).

occasion. (§ 1101, subd. (a).) Section 1109, however, provides several exceptions, two of which are relevant here. The first states that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).) It also addresses child abuse cases, providing that "subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, in a criminal action in which the defendant is accused of an offense involving child abuse, evidence of the defendant's commission of child abuse is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(3).)

Although section 1109 does not "explicitly provide for the admission of acts of domestic violence in a prosecution for an offense involving child abuse, nor vice versa" (*People v. Dallas* (2008) 165 Cal.App.4th 940, 952 (*Dallas*)), subdivision (d)(3) defines " '[d]omestic violence' " to have the further meaning as set forth in section 6211 of the Family Code if the act occurred no more than five years before the charged offense. (§ 1109, subd. (d)(3).) Family Code section 6211, in turn, defines "domestic violence" to include abuse perpetrated against a child of a party. (Fam. Code, § 6211, subd. (e).)

In *Dallas*, the Court of Appeal discussed the admissibility of domestic violence propensity evidence in cases alleging child abuse: An "Assembly analysis stated that using the 'broader definition' of domestic violence in Family Code section 6211 'will have two effects. First, and most important, *prosecutors will be able to use propensity evidence in the prosecution of child abuse cases*.... Second, in any domestic violence case, the prosecutor will be able to bring in relevant evidence of prior violence against children.' " (*Dallas, supra,* 165 Cal.App.4th at p. 956.) As such, "the definition of domestic violence in Family Code section 6211 can apply not only to the type of

evidence admissible under Evidence Code section 1109, subdivision (a)(1), but also to the type of prosecution in which such evidence is admissible." (*Ibid.*)

Thus, prior acts of domestic violence are admissible in a case involving child abuse, subject to an analysis under section 352. The review required by the trial court pursuant to section 352 requires that the court, in its discretion, exclude the evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

A trial court " 'must engage in a careful weighing process under section 352' when admitting propensity evidence." (*Baker, supra,* 10 Cal.5th at p. 1098, quoting *Falsetta, supra,* 21 Cal.4th at p. 917.) "Rather than admit or exclude every ... offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other ... offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, at p. 917; *Baker, supra*, at pp. 1098-1999 [applying factors described in *Falsetta* to determine whether evidence admitted under §§ 1108 and 1109 should have been excluded under § 352].) " '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438 (*Doolin*).)

Appellant argues that there was no substantial similarity between the uncharged incidents of domestic violence against his ex-wife and ex-girlfriends and the evidence of

inflicted trauma to Peyton. Appellant argues the prior domestic violence incidents were motivated by romantic jealousy and a need to control his domestic partner, which have no bearing on his relationship with Peyton.

Although "dissimilarity alone does not compel exclusion" of otherwise admissible propensity evidence (*People v. Cordova* (2015) 62 Cal.4th 104, 133), incidents " 'may be dissimilar enough, or so remote or unconnected to each other, that the trial court could apply the criteria of section 352 and determine that it is not proper for the jury to consider one or more of the ... [other] offenses as evidence that the defendant likely committed' " the offense in question. (*People v. Villatoro, supra,* 54 Cal.4th at p. 1163, citing *People v. Harris* (1998) 60 Cal.App.4th 727, 739-740 (*Harris*).) As to probative value, " '[t]he court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference to prove the issue upon which it is offered ....' [Citation.]" (*Harris, supra,* at pp. 739-740.) Put differently, the uncharged prior offense evidence " 'must have some tendency in reason to show that the defendant is predisposed to engage in conduct *of the type charged.*' " (*People v. Jandres* (2014) 226 Cal.App.4th 340, 355, original italics.)

At trial, Courtney testified that appellant slapped her on an occasion when she tried to get into her vehicle to go home while he was drinking with his family and that, on another occasion, he became angry and held her down when she decided to leave without him to make funeral arrangements for Peyton; Kayla testified that appellant punched her in the face after she slapped him in the mouth during an argument and that he threatened to break her fingers when she tried to call the police; Devyn testified that appellant attacked her violently after she told him she wanted him to move out; Melinda testified that appellant slapped and choked her after they got into an argument; and Aubrey testified that appellant hit and choked her after she and appellant got into an argument at her house before school. Devyn further testified that appellant's daughter Madison began to cry during an argument between Devyn and appellant, and that appellant picked

Madison up, slammed her on the bed, and screamed at her. Devyn also testified that appellant picked up Devyn's son D.M. on one occasion and squeezed him tightly when he would not stop crying.

While the prior domestic violence evidence showed a pattern of romantic jealousy and controlling behavior, it also showed appellant's long history of being unable to control his violent temper whenever he became angry or frustrated. The trial court could reasonably have determined that appellant's prior uncharged domestic violence was relevant to the issue of whether Peyton's injuries were inflicted or accidental.

However, even relevant evidence of past domestic violence may be excluded when its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) " 'Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.] ' "The prejudice which ...section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.) The potential for such prejudice is decreased when testimony describing the defendant's uncharged acts is " 'no stronger and no more inflammatory than the testimony concerning the charged offenses.' " (*Ibid.*)

For instance, in *People v. Jandres, supra,* 226 Cal.App.4th 340, the court found it error to admit evidence of an uncharged prior sex offense against an 11-year-old girl in a prosecution for kidnapping and forcible rape of an older female victim. It found the prior incident could not "rationally support[ ] an inference that defendant [was] predisposed to rape an 18-year-old woman" given the "many differences between the two offenses—including the circumstances ...; the ages of the victims (11 and 18); and the nature of the

conduct." (*Id.* at pp. 353-357.) And in *Harris, supra,* 60 Cal.App.4th 727, the court found it error to admit evidence of a prior, unexplained rape of a stranger in a prosecution for sexual crimes against mental health patients, finding they were "of a significantly different nature and quality" than the prior sex offense. (*Id.* at p. 738.) The court concluded, "The only factor favoring admitting this evidence is that it did not consume much time. Everything else militates against admission: The evidence was remote, inflammatory and nearly irrelevant and likely to confuse the jury." (*Id.* at p. 741.)

Each case must be judged on its own unique facts under section 352. Considering the scope of section 1109, and balancing the appropriate factors as to these incidents, we conclude the trial court did not abuse its discretion in admitting evidence of the incidents.

Here, the prior abuse incidents were certainly not more inflammatory than the current charges; there was no risk of confusion between the former and current charges; and, during this lengthy trial, the evidence was not unduly time consuming. (§ 352.)

Even assuming the trial court erred in allowing some or all of the uncharged domestic violence evidence, any error was harmless. "Error in admitting evidence of a defendant's prior acts of domestic violence under section[ ]1109 ... is subject to the standard of prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)]." (*People v. Megown* (2018) 28 Cal.App.5th 157, 167; *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145.) Under the *Watson* standard, an error is prejudicial only if the defendant shows "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson, supra,* 42 Cal.2d at p. 836.)

Appellant contends that the prosecutor's reliance in argument on the propensity evidence to bolster the prosecution's claim that appellant "has a very violent past," as evidenced by his abuse of Madison and various ex-girlfriends, makes admission of the evidence prejudicial. However, when instructing the jury concerning the uncharged domestic violence evidence, the jury was not only appropriately instructed on reasonable

41.

doubt and the necessity of proof for the elements of the offenses, but also on the limited purpose for which the evidence of prior abuse was admitted, and the requirement that the prior abuse had to be proven by a preponderance of the evidence. (CALCRIM Nos. 220, 303, 852.)[7] We assume the jury followed these instructions and did not misuse the uncharged domestic violence evidence when deciding the charges against appellant. (*People v. Lindberg* (2008) 45 Cal.4th 1, 25-26; *People v. Panah* (2005) 35 Cal.4th 395, 492.)

Furthermore, there was strong circumstantial evidence of appellant's guilt aside from the propensity evidence. Medical evidence showed Peyton had suffered numerous severe physical injuries both before and at the time of her death. According to a variety of experts, the location, the number of the fractures, the extensive trauma to her head, brain, and optic nerves, and the various stages of healing, all suggest the injuries were nonaccidental.

No evidence of bone disease was found in examination of Peyton's blood work and bones by the forensic pathologist, the radiologist, and the pediatric orthopedic surgeon who testified at trial. Peyton, who had lost over 30 percent of her body weight in the two weeks prior to her death, was being cared for by appellant alone both on the day of the alleged fall and the night of her death. Evidence at trial was that appellant was almost completely in charge of Peyton's care.

In sum, we cannot conclude that it is reasonably probable a different result would have occurred if the uncharged domestic violence evidence had been excluded.

---

**7** We address separately, in part H. below, appellant's argument that his convictions must be reversed because the trial court's limiting instruction on the Evidence Code section 1109 evidence reduced the prosecution's burden of proof.

C. DID THE TRIAL COURT ERR IN ADMITTING EVIDENCE OF UNCHARGED DOMESTIC VIOLENCE AGAINST ONE FORMER GIRLFRIEND, AS IT FELL OUTSIDE THE FIVE-YEAR LIMIT OF SECTION 1109, SUBDIVISION (D)(3)?

Appellant next contends the trial court erred in admitting evidence of uncharged domestic violence against Melinda, as it fell outside the "five-year limit" set forth in section 1109, subdivision (d)(3). We find no prejudicial error.

### 1. Background

The prosecutor moved in limine to allow testimony from Melinda regarding two incidents of domestic violence that occurred when she dated appellant. The prosecutor's motion included Melinda's statements to a district attorney investigator, in which she told the investigator she met appellant around 2005 when she was 16 or 17 years old and dated him for two or three years. Melinda told the investigator that on one occasion, appellant slapped her, pushed her onto his bed, straddled her chest, and choked her until she almost passed out. On another occasion, appellant acted as if he was going to punch her and punched a hole in the wall instead.

At the hearing on the motion, defense counsel argued that Melinda's testimony was irrelevant, would constitute undue consumption of time, was cumulative, and was remote in time. The prosecutor stated that appellant was 18 at the time and both he and Melinda were in high school; defense counsel countered that appellant graduated from high school when he was 17 and was born in September of 1989.

In admitting evidence of both incidents described by Melinda, the trial court stated the following:

> "In regards to this incident, where he allegedly got on top of her and straddling her chest and began choking her, normally that would seem to be remote in time, but I don't think remoteness really is a critical factor here. It's a continuing pattern of abusive conduct. And we can't dismiss this as just high school romance that got a little out of control. This is where he was choking someone and gasping for air. So I don't think it's too remote. It just shows for how long this pattern has been there, if the jury wants to accept this."

43.

Melinda subsequently testified to the two incidents at trial.

### 2. *Remoteness*

As previously noted in part B., above, section 1109 does not explicitly provide for the admission of acts of domestic violence in a prosecution for acts of child abuse, nor vice versa. Instead, the way in which "other acts of domestic violence" become admissible in a child abuse prosecution begins by noting section 1109 draws the definition of "domestic violence" from two other statutes—the definition in Penal Code section 13700 which applies without limitation, and the broader definition in Family Code section 6211 which applies "if the act occurred no more than five years before the charged offense" and is subject to a hearing under section 352. (*Dallas, supra,* 165 Cal.App.4th at p. 952.)

Thus, the meaning of " '[d]omestic violence' " depends on the age of the incident. Subdivision (d)(3) of section 1109 states that the term "has the meaning set forth in Section 13700 of the Penal Code," a definition that does not encompass abuse perpetrated by a parent against their child. Rather, it is restricted to a narrow type of abuse (entailing actual, attempted or threatened injury), perpetrated against a narrow class of victims (who, generally described, have or had an intimate relationship with the perpetrator). However, "if the act occurred no more than five years before the charged offense," then the definition of " '[d]omestic violence' " is broader, "Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning" under section 6211 of the Family Code, which is part of the Domestic Violence Prevention Act. (§ 1109, subd. (d)(3).) That broader definition includes a victim who is "[a] child of a party." (Fam. Code, § 6211, subd. (e).)

Appellant's argument is that the trial court abused its discretion in allowing evidence of the acts described by Melinda because they occurred outside the five-year limit of Family Code section 6211 and were therefore nonadmissible.

44.

We first reject respondent's claim that appellant forfeited this issue by failing to object on this basis in the trial court. While appellant may not have argued specifically that the proffered evidence was outside the "five-year statutory limit," defense counsel did argue that the evidence was "remote in time," both parties addressed when the acts allegedly occurred, and the trial court specifically determined that the acts were not "too remote."

The evidence before the trial court as to when the act occurred is not entirely clear. The prosecutor represented that Melinda met appellant in high school "around 2005" when she was about 16 or 17, that appellant was 18, and the two dated for two to three years. Defense counsel noted appellant was born in September of 1989 and graduated from high school when he was 17. The events Melinda testified to were not specifically dated, but allegedly occurred during the time the two were together. The current offenses occurred in November of 2012 and appellant was 23 years old at the time of Peyton's death. As argued by respondent, appellant would have been "about two months past his 18th birthday" when the five-year statutory period began in November of 2007.

In any event, even assuming the alleged acts testified to by Melinda occurred outside the five-year limit, we find no prejudicial error. The incidents at issue were no more inflammatory than the other prior acts of domestic violence which we determined in part B., above, were appropriately admitted. Given the strong evidence of guilt and the other evidence of similar domestic violence, it is not reasonably probable appellant would have obtained a better outcome had Melinda's testimony been excluded. (*Watson, supra,* 46 Cal.2d at p. 836; *People v. Megown, supra,* 28 Cal.App.5th at p. 167.)

D.  DID THE TRIAL COURT ABUSE ITS DISCRETION WHEN IT ALLOWED THE PROSECUTOR TO IMPEACH A DEFENSE WITNESS WITH EVIDENCE OF A PRIOR INCONSISTENT STATEMENT?

Appellant next argued that the trial court abused its discretion when it allowed the prosecutor to impeach defense witness Holly with evidence of a prior domestic violence

incident between Holly and appellant. Appellant further contends the prosecutor engaged in prejudicial misconduct in eliciting this evidence. We disagree.

    *1. Background*

Prior to trial, the prosecutor moved in limine to allow Berumen's ex-girlfriend Shannon to testify about an event that occurred while appellant was dating Berumen's younger sister Holly. According to Shannon, Holly told her she and appellant were lying in bed when they got into an argument because Holly received a text message from another man. Holly told Shannon that appellant grabbed Holly by the throat and choked her while her head was hanging off the side of the mattress.

At the hearing on the motion, the trial court excluded the proffered testimony from Shannon because she had not personally observed the alleged domestic violence.

At trial, the defense called Holly, who testified that she had known appellant since grade school and, at one point, they had a romantic relationship. According to Holly, appellant treated her "good" as both a friend and a girlfriend. On cross-examination, Holly denied ever telling Shannon that appellant grabbed her, shoved her down onto the bed, and strangled her when she received a text message from another man. The defense did not object.

Prior to the start of the prosecution's rebuttal, defense counsel objected to allowing the prosecutor to call Shannon as an impeachment witness, arguing the evidence was irrelevant and involved a collateral matter. The trial court overruled the objection, characterizing Shannon's proposed testimony as "classic impeachment."

Shannon was called and testified that, while she was living with Berumen, Holly once came into their room crying and told Shannon that appellant had just choked her after an argument. Holly's neck was red.

The defense recalled Holly as a surrebuttal witness, who then testified that appellant never choked her. Instead, Holly testified that, on one occasion, she went into

Shannon's room crying and told her appellant had hit her even though he had not. Holly and appellant had gotten into an argument and appellant made Holly slap herself.

2. *Applicable Law and Analysis*

Under section 1235, "[e]vidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Section 770, in turn, provides: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action." (§ 770.)

The trial court has broad discretion to admit or exclude impeachment evidence, including whether it is subject to exclusion under section 352. (*People v. Turner* (2017) 13 Cal.App.5th 397, 408.) "Because the court's discretion to admit … impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court will ordinarily uphold the … exercise of discretion." (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

Here, Holly testified for the defense that appellant treated her "good" while they were friends and while they were dating. On cross-examination, the prosecutor asked Holly about statements she made to Shannon in which appellant "got violent." Holly denied ever having told Shannon anything about such an incident.

During rebuttal, the prosecution then called Shannon who related the incident in which Holly told her appellant had choked her during an argument. When recalled to the stand by the defense, Holly denied ever telling Shannon that appellant got angry and choked her, but said she and appellant had gotten into an argument and appellant made her slap herself.

Appellant contends allowing Shannon's testimony went "beyond an inconsistent statement because it concerned a specific uncharged act of domestic violence and was therefore inadmissible." In support of his argument, appellant cites to *People v. Felix* (1999) 70 Cal.App.4th 426, 431-432.) However, *Felix* is distinguishable because it involved admission of the defendant's prior conviction under section 1102, which provides for the admission of character evidence " 'in the form of an opinion or … reputation,' but not specific instances of conduct." (*Id.* at p. 431.) Unlike in *Felix*, the domestic violence incident involving Holly was not admitted as character evidence under section 1102, but admitted as a prior inconsistent statement to impeach Holly's credibility.

Appellant also argues that the jury was instructed pursuant to CALCRIM No 318 that it could use statements made by a witness before trial "[a]s evidence that the information in those earlier statement is true." But the evidence in question was not admitted to prove that domestic violence actually occurred, but was admitted to impeach Holly's testimony by showing that she had previously made inconsistent statements with her testimony on the stand.

The prosecution was permitted to discredit Holly's in-court denials with evidence that Holly had told Shannon that appellant had choked her. (See *People v. Dalton* (2019) 7 Cal.5th 166, 235 [upholding admission of prior inconsistent statement for impeachment purposes].) As stated in *People v. Johnson* (2018) 6 Cal.5th 541, 583, "An out-of-court statement by a witness that is inconsistent with his or her trial testimony is admissible to establish the truth of the matter asserted, so long as the witness has been given an opportunity while testifying to explain or deny the statement .…" Here, Holly was given an opportunity to explain or deny the statement.

Appellant also argues that the specific act of domestic violence was not admissible because it exceeded the five-year limitation for purposes of relevance to propensity to commit child abuse, a similar argument to that made in part C., above. However, in this

instance, unlike the instance in part C., above, we find appellant has forfeited this issue as no objection was made on this ground below, as acknowledged by appellant. (*People v. Williams* (2008) 43 Cal.4th 584, 620 [failing to make a specific objection to the admission of evidence on the same ground urged on appeal resulted in forfeiture on appeal]; *People v. Nelson* (2012) 209 Cal.App.4th 698, 711 [specificity required to enable court to make an informed ruling and to allow party proffering evidence to cure the evidentiary defect].)

We also find no merit to appellant's assertion that the prosecutor committed misconduct by questioning Shannon about the domestic violence incident involving Holly. " 'A prosecutor is not guilty of misconduct when he questions a witness in accordance with the court's ruling.' " (*People v. Earp* (1999) 20 Cal.4th 826, 861.) Here, the trial court expressly allowed the evidence and the prosecutor's questioning on this subject was not improper.

In any event, even if the trial court erred in permitting Shannon's impeachment testimony, the error was harmless under *Watson, supra,* 46 Cal.2d at p. 836. (See *People v. Megown, supra,* 28 Cal.App.5th at p. 167; *People v. Ogle, supra,* 185 Cal.App.4th at p. 1145.) As discussed in part B., above, there was strong evidence of appellant's guilt. In addition, Shannon's testimony was no more inflammatory than the other properly admitted evidence of prior domestic violence. It is not reasonably probable appellant would have achieved a better outcome had Shannon's testimony been excluded.

We further reject appellant's argument that reversal is warranted because Holly was not mentioned in the CALCRIM No. 852 instruction, which instructed the jury on how to use the uncharged domestic violence evidence. As argued by appellant, without this guidance, the jury was "completely free" to consider this bad character evidence to prove appellant's guilt. Not so. The jury was instructed, pursuant to CALCRIM No. 220, that it must consider all evidence in deciding whether the prosecution proved its case, that it must decide all questions of fact, and give appellant the presumption of

innocence. The jury was repeatedly instructed that the prosecution had the burden of proving each element of the charged crimes beyond a reasonable doubt (CALCRIM Nos. 220, 224, 225, 350, 359, 580, 852) , and that a guilty verdict required a union of act and specific intent (CALCRIM Nos. 252, 520).

Considering the instructions as a whole, the jury would not have believed it could convict appellant of the charged crimes based on the domestic violence evidence involving Holly. (See *People v. Loy* (2011) 52 Cal.4th 46, 75–76 [instructions as a whole bolstered conclusion that the jury would have understood that it had to find facts of the charged crimes proven beyond a reasonable doubt and could not convict defendant of charged sex crimes based solely on the evidence of his prior sex crimes].)

E. DID THE TRIAL COURT ERR IN ALLOWING THE PROSECUTOR TO IMPEACH S.G. BY ELICITING PRIOR STATEMENTS SHE MADE TO A PROSECUTION INVESTIGATOR?

Appellant next contends the trial court erred when it allowed the prosecutor to impeach S.G. by eliciting prior statements S.G. made to a prosecution investigator. Appellant contends the evidence in question constituted evidence of specific bad acts that should not have been admitted to rebut S.G.'s testimony of appellant's good character. We agree with respondent's contention that appellant has forfeited the issue on appeal by failing to raise it below but, in any event, find any error harmless.

*1. Background*

Prior to trial, the prosecutor moved in limine to admit evidence that appellant would tell Madison to "shut up" when she cried and would pass Madison to S.G.'s mother because he did not want to watch Madison. At the hearing on the motion, the prosecutor requested that S.G.'s mother be allowed to testify that she would often watch Madison because appellant did not want to do so. The trial court ruled that the evidence lacked sufficient probative value and would not be allowed.

At trial, the prosecution called S.G., who testified to an incident where appellant covered S.G.'s mouth with his hand to prevent her from breathing. On cross-examination, defense counsel asked S.G., "[F]rom what you observed, [appellant] treated Madison pretty well?" S.G. replied, "From what I had seen." Defense counsel then asked, "[F]rom what you observed he was trying to be a good father to her?" S.G. replied, "He did his best."

At a bench conference, the prosecutor argued that defense counsel had "opened the door" to S.G.'s previous statements that appellant often took Madison to S.G.'s house so they could babysit, and that appellant would become irritated when Madison would cry. Defense counsel argued that this was not included in S.G.'s statement and was something said by a different witness. After the prosecution pointed to the page number in the motion where S.G.'s statements were found, the trial court ruled that it would allow the prosecutor to question S.G. about her prior statements.

On redirect, S.G. then confirmed that she told an investigator that appellant had "a very short temper" with Madison and would get "very frustrated" when Madison would cry. S.G. testified that appellant would yell at Madison to "shut up" and would say "Why won't you shut up?" At times, when this happened at S.G.'s house, appellant would then tell S.G.'s mother to "take the baby." S.G.'s mother would then babysit Madison while S.G. and appellant would "just hang out." Defense counsel did not object to any of S.G.'s testimony.

*2. Applicable Law and Analysis*

Appellant claims the trial court erred and the prosecutor engaged in prejudicial misconduct when S.G.'s opinion that appellant did his best as a father was impeached with specific bad conduct which was previously ruled irrelevant. However, appellant did not argue to the trial court that S.G.'s testimony did not qualify as impeachment evidence or improper character evidence. We therefore agree with respondent that appellant has forfeited any such challenge on appeal. (§ 353, subd. (a); *People v. Carey* (2007) 41

51.

Cal.4th 109, 126; *People v. Boyette* (2002) 29 Cal.4th 381, 424 [" 'Specificity is required both to enable the court to make an informed ruling on the motion or objection and to enable the party proffering the evidence to cure the defect in the evidence.' "].)

In any event, addressing the issue on the merits, we find S.G.'s statements to a prosecution investigator were properly admitted as a prior inconsistent statement to impeach her credibility. As explained in part D., above, an "out-of-court statement by a witness that is inconsistent with his or her testimony is admissible to establish the truth of the matter asserted, so long as the witness has been given an opportunity while testifying to explain or deny the statement or is still subject to recall." (*People v. Johnson, supra,* 6 Cal.5th at p. 583; § 770.) Impeachment evidence is " 'as broad as necessary to deal with the great variety of factual situations in which the issue arises,' " and is subject to review for an abuse of discretion. (*People v. Clark, supra,* 52 Cal.4th at p. 932.)

Here, S.G. testified at trial that appellant treated Madison well and did his best to be a good father to Madison. But S.G. had previously told a prosecution investigator that appellant had a "very short temper" with Madison and would yell at her to "shut up" when she cried. She also told the investigator that appellant would pass Madison off to S.G.'s mother while appellant and S.G. would "hang out." Because these prior statements were inconsistent with her trial testimony, they were admissible to attack S.G.'s credibility. (See *Doolin, supra,* 45 Cal.4th at pp. 435–438 [evidence of the defendant's prior statements properly admitted to impeach defendant's inconsistent testimony].)

Moreover, because the trial court expressly allowed the prosecutor to inquire about S.G.'s prior statements, the questioning by the prosecutor was not improper. (*People v. Pearson, supra,* 56 Cal.4th at p. 434 [prosecutor did not act improperly when trial court exercised discretion in allowing the prosecutor's impeachment]; *People v. Earp, supra,* 20 Cal.4th at p. 861 [no prosecutorial misconduct where examination of witness is consistent with trial court's evidentiary ruling].)

F. DID THE TRIAL COURT ABUSE ITS DISCRETION WHEN IT DECLINED TO STRIKE THE ENTIRETY OF DEVYN'S TESTIMONY?

Appellant next contends the trial court abused its discretion and violated his constitutional right to due process when it denied his motion to strike the entirety of Devyn's testimony after she referred to inadmissible evidence. We disagree.

### 1. Background

Prior to trial, the prosecution moved in limine to admit evidence of an incident of domestic violence involving Devyn, who alleged that, during an argument, appellant grabbed and twisted her C-section incision, ripping her staples open and resulting in an infection and a hospital stay. Defense counsel objected to the evidence as lacking credibility because Devyn did not initially report this injury when contacted by police and it was not corroborated by hospital records. Defense counsel also argued that Devyn's statements were unreliable as they changed over time. The prosecutor argued that the defense could use that information to impeach Devyn, but that Devyn should still be permitted to testify, as many victims of domestic violence "don't tell everything" initially. The trial court ruled that the evidence of the incident would be admitted. It reserved ruling on the C-section incision evidence, pending hospital records to prove the injury occurred.

The prosecutor later obtained hospital records showing that Devyn was admitted for pelvic inflammatory disease and lower back pain. The records indicated that Devyn had been physically harmed by an ex-boyfriend, but no mention was made of an injury to the C-section incision. Defense counsel renewed the objection to Devyn's testimony in its entirety as unreliable. The trial court denied the request and confirmed its earlier ruling that Devyn would be allowed to testify but not permitted to testify about appellant grabbing her C-section incision.

At trial, Devyn testified to an incident in which appellant hit and choked her after she told him to move out of her house. According to Devyn, at some point during the

assault, she lost consciousness and when she regained consciousness, appellant was picking her up by her hair. The prosecutor then asked Devyn what type of injuries she sustained as a result of the attack. Devyn testified that she had marks from being choked, a split eyebrow, bruises and her "C-section got ripped open in the corner." Defense counsel immediately objected, and the court ordered that the last part of Devyn's testimony be stricken.

Following Devyn's testimony, outside the presence of the jury, defense counsel stated that Devyn had violated the trial court's ruling by mentioning the C-section injury. The prosecutor stated that she had admonished Devyn not to mention the C-section injury. The trial court called Devyn back into the courtroom and, while still under oath, asked her if she had been told by the prosecutor not to mention "certain things." Devyn stated that she had been told not to say anything about the C-section incision because there was no paperwork from the hospital to that effect. When asked why she had mentioned it when told not to, Devyn stated "I don't know," but that she had not done so on purpose.

After Devyn was excused, defense counsel asked that the trial court strike the entirety of Devyn and her mother Dorothy's testimonies to remedy the situation. The trial court denied the request, stating:

> "I don't think that's necessary. I wanted to make sure that [the prosecutor] did, in fact, tell that witness not to mention it. She volunteered it. She was told not to say it. She said it anyway. I'm not going to punish the prosecution for that."

When defense counsel argued that was not punishing the prosecution, the trial court replied, "I already told the jury to disregard it. There's nothing more I can do. I'm not going to punish the prosecution by having that testimony it its entirety stricken."

2. *Applicable Law and Analysis*

Striking the entirety of a witness's testimony is a drastic remedy that is usually evoked by a drastic cause and only employed after less severe means are considered, such

54.

as a partial strike.  (E.g., *People v. Price* (1991) 1 Cal.4th 324, 421 [striking entirety of testimony after refusal to answer questions on cross-examination]; *Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 736 [same]; *People v. Reynolds* (1984) 152 Cal.App.3d 42, 47–48 [same].)  The trial court's ruling is reviewed for abuse of discretion.  (*People v. Price, supra,* at p. 421; *People v. Reynolds, supra,* at p. 47.)

In considering a motion to strike all of a witness's testimony, a trial court is to look at both the motive of the witness and the materiality of the testimony.  (See *People v. Sanders* (2010) 189 Cal.App.4th 543, 555; *People v. Seminoff* (2008) 159 Cal.App.4th 518, 525–526.)  Like the prosecutor at trial, respondent on appeal does not dispute that the in limine ruling was violated, but only that the violation did not require a correction as draconian as striking every word of the witness's testimony.  We agree.

In *People v. Navarrete* (2010) 181 Cal.App.4th 828, the defendant moved and was granted the request to suppress a statement he made after his arrest to detectives without having been advised of his *Miranda* rights.  Subsequently at trial, one of the detectives voluntarily made a reference to the suppressed statement in his testimony.  The trial court instructed the jury to disregard the testimony, the witness was dismissed, the trial resumed and, at the close of evidence, the trial court reminded the jury not to consider testimony it had struck.  (*Id.* at pp. 832–833.)  While the court of appeal in *Navarrete* noted that a curative instruction is ordinarily sufficient, in this case it could not "undo the damage" the detective's testimony had done.  (*Id.* at p. 834.)  The court in *Navarrete* specifically noted it had found no case where a curative instruction was sufficient to remedy a witness's improper volunteering of a defendant's inadmissible confession and reversed.  (*Id.* at p. 835, fn. 5, 837–838.)

Here, however, the trial court acted well within its discretion in denying defense counsel's request to strike the entirety of Devyn's testimony.  The mention by Devyn of her C-section injury was brief and not the type of volunteered statement that results in incurable prejudice.  After Devyn violated the in limine ruling by volunteering

55.

inadmissible evidence, defense counsel immediately objected, and the trial court ordered that the offending testimony be stricken. The jury was later instructed with CALCRIM No. 222 that it must disregard any testimony stricken from the record and not consider it for any purpose. We presume jurors follow the instructions of the court. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 172; *People v. Young* (2005) 34 Cal.4th 1149, 1214.)

Appellant also argues that the trial court should have struck Devyn's testimony because it was "unreliable, prejudicial, cumulative, and at most potentially independent proof of nothing more than mere propensity to commit the charged crime." Not so. As discussed in detail in part B., above, Devyn's testimony was properly admitted under section 1109, and her testimony was not outweighed by the probability that its admission would create a substantial danger of undue prejudice under section 352. (See *Dallas, supra,* 165 Cal.App.4th at pp. 952–957.) We do not find that any possibly erroneous admission of Devyn's testimony deprived appellant of his constitutional right to due process or a fair trial. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["admission of evidence even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"].) Devyn's relatively limited testimony was not so prejudicial as to render appellant's trial fundamentally unfair. (See *People v. Brown* (2003) 31 Cal.4th 518, 545 ["routine application of state evidentiary law does not implicate defendant's constitutional rights"].) Further, the defense was also free to attack Devyn's credibility, which it did during cross-examination.

We also reject appellant's claim that the prosecutor committed misconduct in violating the in limine ruling by having Devyn testify to the C-section injury. "It is misconduct for a prosecutor to violate a court order ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order.' [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.) If the prosecutor believes a witness may give an

inadmissible answer during examination, he must warn the witness to refrain from doing so. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406.)

Here, following Devyn's testimony, the trial court called Devyn back into court outside the presence of the jury and confirmed that the prosecutor had indeed admonished her not to testify about the C-section injury. Devyn told the trial court that she did not know why she mentioned the C-section injury and had not purposefully set out to disobey the prosecutor's admonishment not to do so. Having determined that it was Devyn who volunteered the C-section testimony despite being admonished not to, the trial court stated that there was no reason to punish the prosecutor for Devyn's misconduct. We find no prosecutorial misconduct occurred in this situation wherein Devyn volunteered the inadmissible evidence despite being instructed not to do by the prosecutor.

G. DID THE TRIAL COURT ABUSE ITS DISCRETION AND VIOLATE APPELLANT'S CONSTITUTIONAL RIGHTS WHEN IT ALLOWED THE PROSECUTOR TO PRESENT EXPERT TESTIMONY ON INTIMATE PARTNER BATTERING AND THE CYCLE OF VIOLENCE?

Appellant next argues that the trial court abused its discretion and violated his constitutional rights by allowing the prosecution to present expert testimony on intimate partner battering and the "cycle of violence." We disagree.

*1. Background*

Prior to trial, defense counsel moved in limine to exclude testimony of domestic violence expert Meader on grounds that she was not qualified to testify on the topic of emotional abuse and that her testimony was not relevant to any issue in the case. At the hearing on the motion, the prosecutor argued that Meader's testimony was necessary given the defense's claim that the domestic violence witness's statements had changed over time, noting that these witnesses, at times, minimize or recant.

The trial court found the expert testimony relevant, stating:

"The relevancy would be these witnesses who are coming in under [section] 1109, and if they have minimized what they believe happened to

them, if they've delayed reporting, a number of different things that may have happened. If an expert has some special knowledge about what characterized a person going through that, a jury should be able to have that information."

The court also disagreed with defense counsel's argument that the expert testimony was too far removed from the issues in the case and noted it would not take an undue consumption of time. Instead, her testimony would be general information on "what may occur when someone has suffered abuse, physical and/or psychological in a domestic setting." The trial court stated it would conduct a section 402 hearing on Meader's expertise.

At the section 402 hearing, Meader testified as to her education and experience on the subject of domestic violence. Meader was the executive director of Family Services for Tulare County, a nonprofit victim services provider working with victims of domestic violence, sexual assault and families in crisis. She had previously worked as a certified domestic violence crisis counselor, but was not a licensed therapist. Meader had helped establish a high risk assessment team for Tulare County, whose purpose it was to conduct assessments during domestic violence calls to determine whether a particular case was escalating toward lethal or near lethal levels. She had taught classes on the cycle of domestic violence for several years.

Following Meader's testimony at the hearing and further argument by the parties, the trial court found that the probative value of Meader's testimony was not outweighed by the probability of undue prejudice or an undue consumption of time.

At trial, Meader testified about the three phases comprising the cycle of domestic violence and she explained further her involvement in the high risk assessment team. She explained that law enforcement officers trained by the team utilize a questionnaire to determine whether a relationship may be approaching a "lethal or near lethal situation."

During a break in the proceedings, defense counsel renewed its objection, arguing that the testimony was more prejudicial than probative and that Meader's testimony

58.

regarding the lethality assessment implied such an assessment was done in this case. The trial court stated it would not change its prior ruling.

    2. *Applicable Law and Analysis*

Section 801, subdivision (a) permits expert testimony on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." Section 1107 provides: "(a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge. [¶] (b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. Expert opinion testimony on intimate partner battering and its effects shall not be considered a new scientific technique whose reliability is unproven." (§ 1107, subds. (a), (b).)

Expert testimony about the effects of intimate partner battering "speaks directly to both recantation and reunion by a domestic abuse victim ...." (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 594.) "When the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim had earlier told the police, the jurors may well assume that the victim is an untruthful or unreliable witness. [Citations.] And when the victim's trial testimony supports the defendant or minimizes the violence of his actions, the jurors may assume that if there really had been abusive behavior, the victim would not be testifying in the defendant's favor." (*People v. Brown* (2004) 33 Cal.4th 892, 906.) Expert testimony on intimate partner battering is generally relevant and admissible "to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand." (*People v. Riggs* (2008) 44 Cal.4th 248, 293; see *People v. Kovacich* (2011) 201

Cal.App.4th 863, 903 ["expert testimony on domestic violence may include general descriptions of abuser behavior in order to 'explain the victim's actions in light of the abusive conduct' "].)

And, as previously explained, section 352 provides that the court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) The trial court is vested with broad discretion in ruling on the admissibility of evidence and we do not upset that ruling unless there is a clear showing that the trial court has exceeded the bounds of reason. (*People v. Dean* (2009) 174 Cal.App.4th 186, 193.)

Appellant disputes the relevancy of expert testimony on intimate partner battering and its effects. As argued by appellant, the trial court abused its discretion here "under the peculiar facts of this case because the behavior of the women subjected to the uncharged domestic violence in this trial was not relevant to whether [appellant] committed torture-murder or child-abuse homicide as alleged, not the lesser offense of murder and aggravated assault as found by the jury." We disagree.

The trial court properly admitted the evidence as it was relevant in assessing the credibility of the domestic violence witnesses called by the prosecution and in understanding why domestic violence victims may minimize or fail to report abuse. All but one of appellant's ex-girlfriends who testified failed to report the incidents of abuse to law enforcement, or even others around them, and some continued their relationship with appellant after they had been abused. Without the expert testimony, the jurors may have disbelieved their testimony. The expert testimony was also relevant to explain why Courtney minimized appellant's behavior and made excuses for it.

We also reject appellant's argument that Meader's testimony was impermissible profile evidence. Profile evidence is a type of character evidence which can be described as expert testimony to identify a person who commits a certain crime as having particular

characteristics or behaving in a certain way, and it allows the jury to draw an impermissible inference that the defendant is guilty solely because he matches the profile. (*People v. Smith* (2005) 35 Cal.4th 334, 358, disapproved on another ground in *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 670; *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084.)  As noted by appellant, such evidence has been held improper and inadmissible where the expert attempted to provide a profile of a rapist (*People v. Robbie, supra,* at pp. 1085–1088), a drug dealer (*People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1071– 1072), a truck thief (*People v. Martinez* (1992) 10 Cal.App.4th 1001, 1006), and a drug courier (*United States v. Beltran-Rios* (9th Cir. 1989) 878 F.2d 1208, 1210.)

However, Meader's testimony did not constitute impermissible profile evidence. She did not testify as to the profile of domestic abusers, nor did she suggest that appellant fit the profile of an abuser.  (See *People v. Prince* (2007) 40 Cal.4th 1179, 1226 ["profile testimony" involves expert comparing "the behavior of the defendant to the pattern or profile" and the expert concluding "the defendant fits the profile"].)  Here, Meader testified that she had not reviewed any records in the case and was not there to provide any kind of assessment and diagnosis.  Nor did the prosecutor elicit improper profile evidence by posing hypothetical questions to Meader regarding appellant's behavior. (See *People v. Robbie, supra,* 92 Cal.App.4th at p. 1084 [prosecutor's hypothetical questions elicited improper expert opinion that the defendant's behavior was typical of a sex offender].)

We find no abuse of discretion and therefore no constitutional error on the part of the trial court in admitting expert testimony on the issue of intimate partner battering and the cycle of violence.  (See *People v. Roybal* (1998) 19 Cal.4th 481, 506, fn. 2 [finding no abuse of discretion by the trial court and thus, no predicate error to base constitutional claims]; *People v. Davis* (1995) 10 Cal.4th 463, 506, fn. 7 [no federal constitutional violation where defendant simply "recasts his state claim under constitutional labels"].)

In any event, even if error is found, erroneous admission of expert testimony only warrants reversal if " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Prieto* (2003) 30 Cal.4th 226, 247, quoting *Watson, supra,* 46 Cal.2d at p. 836.)

Meader testified about domestic violence relationships in general and never addressed specific facts of this case, she made it clear that she had not reviewed any records in this case, and she specifically testified that it was not within her scope to render a diagnosis or assessment about anyone involved in the case.

Appellant also contends that the prosecutor improperly argued that appellant fit the profile of an abuser during closing and rebuttal argument. Appellant points to argument made by the prosecutor in closing in which she described an abuser as one who "verbally abuse[s]", "[t]hey beat. They choke. They prevent this other person from leaving. They're very jealous, and then they start apologizing. They cry. They like to slap," and are "[v]ery manipulative." And appellant points to argument made by the prosecutor in rebuttal when he suggested that appellant pretended to find Peyton unresponsive, woke Courtney and pretended to be concerned by calling 911 and performing CPR, and then crying at the hospital, and argued "if you remember, testimony, every time he choked out one of his girlfriends, then he would cry. So you know, he's a manipulator. He's manipulative." However, the prosecutor was simply repeating Meader's testimony about the behavior of a typical abuser, pointing out some of appellant's traits, and leaving it to the jury to decide if appellant's behavior was similar to that described by Meader.

Finally, as previously discussed in part B., above, there was very strong evidence of appellant's guilt, and it is not reasonably likely appellant would have obtained a more favorable result absent Meader's testimony.

H. DID THE TRIAL COURT'S INSTRUCTION ON THE USE THE UNCHARGED DOMESTIC VIOLENCE EVIDENCE AGAINST HIS FORMER PARTNERS AND OTHER CHILD REDUCE THE PROSECUTION'S BURDEN OF PROOF?

Appellant next contends that the trial court erred prejudicially when it instructed the jury with CALCRIM No. 852, which appellant describes as a "defective instruction concerning uncharged domestic-violence evidence." We find no prejudicial error.

### 1. Background

During a jury instruction hearing, the trial court stated that it would give CALCRIM No. 303. Defense counsel acknowledged that this instruction would apply to the "propensity evidence." Later during the hearing, defense counsel objected to including Madison in the proposed CALCRIM No. 852 instruction, but the trial court determined Madison should be included as there was witness testimony about abusive behavior toward Madison. There was no further objection or discussion regarding this instruction.

Subsequently, the trial court instructed the jury with CALCRIM No. 303 as follows:

> "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

And, it instructed with CALCRIM No. 852[8] as follows:

> "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically battery against Kayla B[.], Devyn H[.], [S.G.], Melinda W[.], Aubrey H[.], his former girlfriends. The People also presented evidence that defendant committed domestic violence that was not charged in this case, specifically abuse against Courtney R[.], defendant's ex-wife, and his daughter Madison that he fathered with ex-girlfriend, Kayla B[.]

---

[8]     CALCRIM No. 852 has since been split into CALCRIM No. 852A (uncharged domestic violence) and CALCRIM No. 852B (charged domestic violence).

"Domestic violence in this case as defined by Family Code section 6211, means abuse perpetrated against any of the following persons:""

"(a) A spouse or former spouse.

"(b) A cohabitant or former cohabitant, as defined in Section 6209.

"(c) A person with whom the respondent is having or has had a dating or engagement relationship.

"(d) A person with whom the respondent has had a child, where the presumption applies that the male parent is the father of the child of the female parent under the Uniform Parentage Act (Part 3 (commencing with Section 7600) of Division 12).

"(e) A child of a party or a child who is the subject of an action under the Uniform Parentage Act, where the presumption applies that the male parent is the father of the child to be protected.

"(f) Any other person related by consanguinity or affinity within the second degree.

"Abuse means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit *and did commit Domestic Battery, on Kayla B[.], Devyn H[.], [S.G.], Melinda W[.], Aubrey H[.], Courtney R[.], and Madison B[.],* as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the

64.

defendant is guilty of *Domestic Battery*. The People must still prove each element of every charge beyond a reasonable doubt." (Italics added.)

2. *Applicable Law and Analysis*

Appellant contends that particular wording in the last paragraph of the instruction, as italicized above, "missed entirely the point and purpose of the limiting instruction, and constituted per se reversible error." As argued by appellant, the Bench Notes for CALCRIM No. 852 direct the trial court to insert, where the italicized section of this paragraph appear, "the charged offense involving domestic violence." If properly done, the jury instruction would have invited jurors to infer from the evidence of domestic abuse perpetrated by appellant upon his ex-wife, former girlfriends, and baby Madison, that he was "disposed or inclined to commit domestic violence and, based on that decision, also conclude the defendant was likely to commit torture-murder and/or child-abuse homicide, as charged here, or the lesser included offenses of second-degree murder, aggravated assault, or simple assault." In addition, as argued by appellant, a "properly-formatted instruction would also have informed jurors the uncharged domestic abuse 'is not sufficient by itself to prove the defendant is guilty of torture-murder, child-abuse homicide, nor the lesser included offenses.' "

As argued by appellant, because the instruction was given as it was, the jury would only be able to use the uncharged domestic violence evidence to find appellant guilty of domestic battery against these women, which he was not charged with, and provided no guidance on how to use this evidence in relation to the charged offenses. Appellant contends this allowed the jury to use the evidence to judge him guilty of murder and assault "based on his bad-character *by itself*." (Original italics.)

We find fault with appellant's argument on several grounds. First, appellant failed to object to the instruction as proposed (other than to voice his concern about the inclusion of Madison). While the instruction, as given, is somewhat ambiguous, appellant did not ask the trial court to clarify the instruction. He certainly did not request

that the wording "Do not consider this evidence for any other purpose," which is required to be given on request, be given. (Cal Bench Notes, CALCRIM No. 852.) Failure to object to instructional error in the court below results in forfeiture of the claim on appeal. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

Nevertheless, an instructional error claim may be reviewed by an appellate court if it affects the defendant's substantial rights, i.e., whether the error resulted in a miscarriage of justice. (See, e.g., *People v. Kerley* (2018) 23 Cal.App.5th 513, 542 (*Kerley*) [defendant's failure to object to CALCRIM No. 852 did not forfeit claim that instruction violated substantial rights]; *People v. Anderson, supra,* 152 Cal.App.4th at p. 927.) For that reason, we address appellant's claim that the giving of CALCRIM No. 852 lowered the prosecution's burden of proof, but find no error.

A trial court has the duty to instruct the jury, sua sponte, on the general principles that are closely and openly connected with the facts of the case. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) When we address a claim of jury misinstruction, we assess the instructions as a whole, and view the challenged instruction in context of the other instructions given, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.] 'Moreover, any theoretical possibility of confusion [may be] diminished by the parties closing arguments .…' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) We presume jurors are able to follow, understand and correlate the trial court's instructions. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

On its face, CALCRIM No. 852 comports with due process, the law of conflicting inferences, and the burden of proof. (*People v. Johnson* (2008) 164 Cal.App.4th 731, 739–740.) It correctly states the law. (*People v. Reyes* (2008) 160 Cal.App.4th 246,

251–252.) Appellant's claim involves mistakes or changes within the instruction as given.

The use notes for CALCRIM No. 852 direct the trial court to insert the charged offenses involving domestic violence in the final paragraph of the instruction. Here, instead of instructing the jurors that they could consider the uncharged evidence to find appellant committed the charged crimes of murder and assault on a child causing death, the instruction, as given, told the jury that it could use the uncharged domestic violence evidence to find appellant guilty of the crime of domestic battery against the persons listed in the instructions. Appellant contends this left the jury free to use the uncharged domestic violence evidence as the sole basis for convicting appellant of second degree murder and assault. We disagree.

In *Kerley, supra,* 23 Cal.App.5th 513, the defendant was convicted of murdering his former girlfriend. (*Id.* at p. 520.) At trial, the court admitted evidence of numerous instances of prior domestic violence, and the jury was instructed with CALCRIM No. 852, but mistakenly omitted the last two paragraphs of that instruction. On appeal, the defendant argued that the partial instruction as given permitted the jury to convict him of murder based on a preponderance of evidence. (*Kerley, supra,* at p. 542.)

The court in *Kerley* disagreed, finding that nothing in the instruction authorized the jury to use the preponderance of the evidence standard for anything other than the preliminary determination whether the defendant committed prior acts of domestic violence. (*Kerley, supra,* 23 Cal.App.5th at p. 543.) The court noted that the instructions as a whole repeatedly explained the prosecution's burden of proving the defendant's guilt beyond a reasonable doubt, and nothing in the instruction, as given, cancelled these other reasonable doubt instructions. (*Ibid.*) The *Kerley* court further noted that "the incomplete jury instruction actually given in this case *omitted* the very language that arguably could lead a jury to convict the defendant of the charged crime based upon the lower standard of proof. The jury in the present case was *not* told it may infer from the

67.

prior acts of domestic violence that the defendant 'was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit *and did commit* the charged murder." (*Ibid.,* original italics.)

Here, while the jury was mistakenly instructed that it could use the uncharged evidence to conclude appellant committed the crime of domestic battery, it was instructed in the first part of the final paragraph that it could conclude from the uncharged evidence that appellant "was disposed or inclined to commit domestic violence." This is a permissible inference. (Cf. *People v. Reliford* (2003) 29 Cal.4th 1007, 1012 [reasonable to infer that defendant has disposition to commit sex crimes based on evidence that defendant committed other sex crimes].)

The jury was instructed, later in that same paragraph, that, "[i]f you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence." And while the following sentence again mistakenly refers to domestic battery ("It is not sufficient to prove that the defendant is guilty of Domestic Battery"), the very next line instructs that "The People must still prove each element of *every charge* beyond a reasonable doubt." (Italics added.)

It could be argued that, by giving the instruction as it did, the instruction, similar to that given in *Kerley*, effectively "*omitted* the very language that arguably could lead a jury to convict the defendant of the charged crime based upon the lower standard of proof." (*Kerley, supra,* 23 Cal.App.5th at p. 543.) Because the jurors were not expressly told they could consider the uncharged domestic violence to conclude appellant committed the charged murder, they were less likely to use the prior domestic violence evidence to convict appellant of the charged murder than if they had been properly instructed with CALCRIM No. 852.

In any event, in addition, as noted above, the jury was further instructed with CALCRIM No. 303 that certain evidence was admitted for a limited purpose and could

only be considered for that purpose and no other. The jury was also instructed that proof by a preponderance of the evidence is different than proof beyond a reasonable doubt (CALCRIM No. 852); that it must consider all evidence in deciding whether the prosecution proved its case (CALCRIM No. 220); that it must decide all questions of fact (CALCRIM No. 222); and that it must give appellant the presumption of innocence (CALCRIM No. 220). And the jury was instructed that the prosecution had the burden of proving each element of the charged crimes beyond a reasonable doubt (CALCRIM Nos. 220, 224, 225, 350, 359, 580, 852); that a guilty verdict required a union of act and specific intent (CALCRIM Nos. 252, 520); and that it must consider all of the instructions together (CALCRIM No. 200). It is presumed jurors are "able to understand and correlate instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Appellant relies on *People v. Frazier* (2001) 89 Cal.App.4th 30 (*Frazier*), for the proposition that the configuration of instructions and the verdicts in this case (the jury's rejection of the prosecution's theories as to the more serious charged offenses, and finding guilt on the lesser included offenses) demonstrate that the instructions as a whole do not lead to a conclusion that the error in giving CALCRIM No 852 as it did was harmless. In *Frazier*, the defendant was charged with lewd conduct on a minor and the trial court instructed the jury on the use of evidence of uncharged sex crimes. The court in *Frazier* found that,

> "Given the confusion which results from attempting to apply the court's instructions 'as a whole,' it would be very tempting for a jury to take the path of least resistance which leads directly from evidence of the defendant's disposition to a guilty verdict and thereby avoids the troubling waters represented by the remainder of the evidence and instructions. Such a deliberative process is reasonably likely given the strong appeal of propensity evidence, particularly where the other evidence is closely balanced or there is a disagreement among the jurors over the strength of the other evidence." (*Frazier, supra,* 89 Cal.App.4th at p. 37.)

69.

The problem with appellant's reliance on *Frazier* is that the instruction given relied on an earlier version of Evidence Code section 1108. That instruction was also an earlier version of CALJIC No. 2.50.01, and did not include the cautionary instruction added in a later version of that instruction, which stated: " 'However, if you find by a preponderance of the evidence that the defendant committed prior sexual offenses, *that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes.*' " (*Frazier, supra,* 89 Cal.App.4th at pp. 34–35, fn. omitted, original italics.) The *Frazier* court held that the instruction, as given, was constitutionally infirm because it told jurors they could convict the defendant of the charged offenses based solely on their determination he had committed prior sexual offenses and that no other instruction given "made up for the essential element missing from former CALJIC No. 2.50.01." (*Id.* at p. 35.) Such was not the case here.

Finally, closing argument eliminated any possibility of confusion and reinforced the prosecution's requirement to prove the elements of the charged offenses beyond a reasonable doubt. (See *People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1220 [" 'any theoretical possibility of confusion [may be] diminished by the parties' closing arguments' "].) During closing, the prosecutor reminded the jury that appellant was entitled to the presumption of innocence, that the prosecution had the burden of proving appellant's guilt beyond a reasonable doubt, and to "impartially compare and consider all the evidence that was received throughout the entire trial." The prosecutor listed all element of the charged offenses that must be proved, including the requisite mental state. The prosecutor did not argue that the jury could convict appellant solely based on the uncharged evidence of domestic violence and did not mention any of the uncharged domestic violence evidence during rebuttal.

Defense counsel, in closing, also reminded the jurors of the presumption of innocence and of the prosecution's burden of proving every element of the charged crimes beyond a reasonable doubt. And defense counsel explained that the jurors could

70.

not convict appellant based on the evidence of uncharged domestic violence presented at trial.

We find no prejudicial error in the giving of CALCRIM No. 852.

I. DID THE TRIAL COURT ERR IN INSTRUCTING ON CHARACTER EVIDENCE WITH CALCRIM NO. 350?

Appellant next contends the trial court erred when it instructed the jury on character evidence with CALCRIM No. 350. We find no error.

### 1. Background

At the hearing on jury instructions, defense counsel requested that CALCRIM No. 350 be given and submitted a modified version of the instruction, which the court agreed to give. The jury was subsequently instructed with CALCRIM No. 350 as follows:

> "You have heard character testimony that [appellant] is [a] good, loving, attentive and proud person. Evidence of the defendant's character for good, loving, attentive and proud father can itself create a reasonable doubt whether the defendant committed Murder as charged in Count 1 and Assault Causing Death of a Child as charged in Count 2. However, evidence of the defendant's good character may be countered by evidence of his bad character for the same trait. You must decide the meaning and importance of the character evidence. [¶] You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

### 2. Applicable Law and Analysis

Appellant argues the CALCRIM No. 350 instruction as given was erroneous because the instruction only referred to the charged offenses of murder and assault causing death and that the jury likely mistakenly believed it could not consider the good character evidence in deciding whether appellant was guilty of the lesser offenses. Put another way, appellant argues the instruction was not complete. He does not contend that jury instruction was an incorrect statement of law.

In criminal cases " '[a] trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the

court." ' " (*People v. Gutierrez, supra,* 45 Cal.4th at p. 824; see *People v. Breverman* (1998) 19 Cal.4th 142, 154.)  However, the court " 'need not instruct on specific points or special theories which might be applicable to a particular case, absent a request for such an instruction.' " (*People v. Garvin* (2003) 110 Cal.App.4th 484, 488–489.)  Such instructions, which are known as pinpoint instructions, " 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case' " and are not required to be given sua sponte.  (*People v. Rogers* (2006) 39 Cal.4th 826, 878.)  "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."  (*People v. Lang* (1989) 49 Cal.3d 991, 1024, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; accord *People v. Livingstone* (2012) 53 Cal.4th 1145, 1166; *People v. Lewis* (2001) 26 Cal.4th 334, 380.)  Accordingly, this claim is forfeited.

Assuming this challenge is not forfeited, we review a claim that the court's instructions were incorrect or misleading, we inquire as to whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant.  (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)  In so doing, "[w]e consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions."  (*Ibid.*)

On the record here, we find no instructional error.  The trial court instructed the jury under CALCRIM No. 350 as appellant requested.  It had no further duty to sua sponte provide the precise language appellant now argues should have been given.  Further, as given, the character evidence instruction did not limit or preclude the jury from considering the evidence on the lesser included offenses, as clarified in the final sentence of the instruction: "You may take that testimony into consideration along with all other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

Because we find no instructional error, we need not address appellant's argument in the alternative that he received ineffective assistance of counsel for counsel's failure to request modification to the instruction.

J.  MUST THE CONVICTION BE REVERSED DUE TO REPEATED INSTANCES OF PROSECUTORIAL ERROR?

Appellant next contends the prosecutor committed repeated instances of misconduct, and cites numerous specific instances.  We chronicle and address each of appellant's claimed instances of prosecutorial misconduct, but find no prejudicial error, either considered individually or cumulatively.

### 1.  Applicable Law

A prosecutor's conduct violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to deny a defendant due process.  Conduct by the prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 427 (*Bryant*); *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  It is misconduct for a prosecutor to misstate the law during argument, misstate or mischaracterize the evidence, or assert facts not in evidence.  (*People v. Whalen* (2013) 56 Cal.4th 1, 77, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 44, fn. 17; *People v. Davis* (2005) 36 Cal.4th 510, 550; *People v. Cunningham* (2001) 25 Cal.4th 926, 1026.)

When prosecutorial misconduct is based on the prosecution's comments in front of the jury, we consider whether there is a reasonable likelihood the jury construed or applied any of the complained-of remarks in an objectionable fashion.  (*Bryant, supra,* 60 Cal.4th at p. 427.)  We review the challenged statements within the context of the record and argument as a whole.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.)  In addition, we do not lightly infer that the jury drew the most, rather than the least, damaging

meaning from the prosecution's statements. (*People v. Shazier* (2014) 60 Cal.4th 109, 144.)

"Generally, a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.)

### 2. *Instances of Alleged Prosecutorial Error and Analysis*

#### a. *Pretrial discovery*

Appellant contends first that the prosecutor committed misconduct when she misled the trial court regarding pretrial discovery.

On November 21, 2017, prior to trial**,** a hearing was held on a defense motion to compel discovery of Courtney's laptop computer. The computer had been subjected to extraction analysis by the prosecution and released to Courtney. Defense counsel was under the impression the laptop was seized pursuant to a search warrant and therefor improperly released to Courtney without notice to the defense. When asked, the prosecutor stated she had discussed with Courtney's attorney and the original public defender in the case and found there was no reason to keep the laptop and released it.

However, the public defender was no longer representing appellant and current defense counsel "was unaware after searching records of any notice to or consultation with [the public defender] regarding the proposed release of the laptop." On November 28, 2017, defense counsel filed a motion to strike the prosecutor's earlier unsworn statement from the court's consideration on the motion to compel discovery, asserting that the prosecutor "represented to the court that she had a conversation" with Courtney's attorney and the public defender and claimed both had agreed to release the laptop to Courtney.

On December 6, 2017, the prosecutor informed the trial court that she did not intend to respond to a request for a declaration as to the time, place, and circumstances she conversed with the public defender.

On February 5, 2018, defense counsel, citing the "rigorous standards required in a death penalty case," filed a motion to dismiss the torture special circumstance on grounds of prosecutor error by misrepresenting material information, namely that she falsely claimed she had had a verbal conversation with the public defender in which he acquiesced to release of the laptop. Attached to the motion was a written declaration from the former public defender that he was unaware Courtney had a laptop seized into evidence and had not discussed the laptop with the prosecutor.

The prosecutor denied any violation of a rule requiring notice to defense counsel prior to release of the laptop because the laptop was not seized pursuant to a search warrant but had been voluntarily turned over to the prosecution by Courtney's sister. The contents were then extracted pursuant to a warrant and the extraction analysis was turned over to the defense. No mention was made by the prosecutor of having misled the trial court and defense counsel by stating she had conferred with the public defender.

In reply to the opposition, defense counsel noted the prosecutor's failure to address the alleged conversation and argued that, despite no discovery error or improper release without notice to defense, the prosecutor still misled the trial court.

At the hearing on the motion April 19, 2018, the prosecutor denied making any misrepresentations to the trial court, stating she told the public defender that, at some point, Courtney would want her laptop back. According to the prosecutor, once the "imaging" of the hard drive was complete, the defense was provided with an exact duplicate of the contents of the laptop.

The trial court denied defense counsel's request, stating that it would be a violation of the separation of powers to sanction the prosecution by removing the possibility of the death penalty. The court further stated that it could not "think of

75.

anything more serious than any attorney coming into court and representing to me something that's not true," but it denied defense counsel's motion because the court could not "make a finding that there was a misrepresentation." While the court stated there were "accusations back and forth" "[i]t did not happen in court in front of me."

Appellant argues that, "[a]lthough the motion to dismiss the special circumstance was implicitly denied, and the jury ultimately rejected the prosecutor's theory of first-degree murder with a special circumstance, the appearance of the prosecutor perpetrating a deliberate falsehood foreshadows the numerous prosecutor errors during the trial and, thus, warrants attention in this brief, mention by this [appellate] court," and "serve[s] as links in a chain of persistent misconduct."

We find appellant's claim overreaching and that he has failed to establish any misconduct by the prosecutor on this issue. We therefore reject his claim to the contrary.

### b. Testimony that appellant was unemployed

Appellant next argues that the prosecutor committed misconduct by eliciting testimony that appellant was unemployed, in violation of a court ruling.

On March 23, 2018, during a pretrial hearing, the prosecutor offered to prove Courtney's sister Nicole was advised by Shannon to warn Courtney to stay clear of appellant because Shannon heard appellant was violent. An objection on multiple layers of hearsay was sustained. The prosecutor asked for permission to introduce evidence that Nicole warned Courtney not to go out with appellant, without going into details. When asked by the trial court the reason for the warning, the prosecutor explained it was violence and that appellant did not work. Defense again objected and the trial court ruled it would not allow it.

When the prosecutor argued that the warning was relevant to the prosecution's theory of appellant's propensity for violence, the trial court interjected that, as noted by the prosecutor earlier, the warning could have been that he was not a good provider or that he did not work and "[w]e're not going there."

Subsequently, during the People's opening statement, the prosecutor told the jury that evidence would show that, when Courtney met appellant, she had a full-time job, appellant did not have a job or "much of a job history," and that when Courtney tried to inform appellant about potential employment, he was "never really interested in working" and always "had excuses." Defense counsel's objections on grounds that the prosecutor stated facts not in evidence were overruled.

At trial, on direct examination, Detective Smythe was asked about appellant's initial interview statement at the hospital in which Smythe had asked appellant where he worked. Defense counsel's objection on grounds of relevance was overruled and Smythe answered, "Unemployed."

On May 31, 2018, defense counsel argued, outside the presence of the jury, that appellant's employment status was irrelevant. The trial court agreed that appellant's employment status had come into evidence and ordered that it not be referred to further. The prosecutor then stated that a defense witness would be testifying that appellant had a job. Defense counsel argued that this was a "second-phase issue," but the prosecutor noted the witness was listed for both the guilt and penalty phases of the trial and did not think the issue had been brought up before the court. The trial court simply said, "okay," and the parties moved on to another issue.

Later, during direct examination of Courtney, the prosecutor asked Courtney if she was working full-time when appellant moved in with her. She testified that she was. When asked if appellant was working, she replied "[n]o," and when asked what he was doing, she replied, "[s]leeping, playing video games." Courtney further testified that appellant probably worked "two weeks total" when they were together. And still later, the prosecutor asked Courtney if appellant picked up work while she was pregnant, to which she said "[n]o."

At this point, defense counsel objected on grounds that the questions violated one of the trial court's prior in limine rulings. The trial court sustained the objection. Outside

the presence of the jury, defense counsel requested that the trial court admonish the jury to disregard any questions or answers about appellant's employment. The prosecutor argued that appellant's employment status was relevant because "he's saying he's a good father." The trial court stated that appellant could be a good father and not working and that it would admonish the jury to disregard the evidence. When the jury returned, the trial court stated: "[t]here's been some testimony regarding the defendant's employment status. It's really not relevant. So you really need to disregard that."

On further direct examination of Detective Smythe, the prosecutor questioned Smythe about his pre-trial interview with Berumen. When asked how well Berumen knew Courtney and whether they socialized, Berumen testified that they did not. The prosecutor then asked Smythe what he recalled Berumen said "about that," to which Smythe replied that Berumen told him appellant "had finally found someone that had a job." Defense counsel objected on grounds that the response called for speculation and lacked foundation. After a read back, the trial court overruled the objection. Smythe then testified that appellant "finally found a female that had a job, some money, provided him with a car." Defense counsel objected again, this time on grounds that the answer was nonresponsive. The trial court sustained the objection and granted defense counsel's request to strike the answer.

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order. [Citation.]" (*People v. Crew, supra,* 31 Cal.4th at p. 839.) It is also misconduct for a prosecutor to make remarks in opening statement or closing arguments that refer to evidence which has been determined to be inadmissible in a previous ruling by the court. (*Ibid.*)

Here, we find no misconduct. During the pretrial hearing on the motion in limine, the trial court ruled that the prosecutor could not elicit evidence about Nicole's warning to Courtney to stay away from appellant. The trial court's ruling that "We're not going there" was not a ruling that the prosecutor was forbidden to elicit evidence about

78.

appellant's unemployment, but about the alleged warning that appellant had the propensity for violence. Thus, the prosecutor's reference to appellant's employment status during opening statement and during the initial direct examination of Detective Smythe was not misconduct, which is further evidenced by the court overruling all three of defense counsel's initial objections to those arguments.

When defense counsel brought up the issue of appellant's employment status several days later and stated it was irrelevant, the trial court noted that appellant's employment status was already in evidence, but agreed that it need not be referred to further. However, when it was pointed out that defense counsel also had a witness who would testify that appellant had a job, the trial court simply said, "Okay," making it uncertain whether this issue was still off limits.

It was not until later still, during Courtney's testimony, that the trial court sustained an objection to the prosecutor's question about whether appellant obtained employment while Courtney was pregnant. The court also admonished the jury to disregard the evidence of appellant's employment status.

And finally, Detective Smythe, on further direct examination, when the prosecutor asked if Berumen had said anything about socializing with Courtney and appellant, Smythe testified that Berumen had said appellant "had finally found a female that had a job, some money, provided him with a car." This question did not invite the response Smythe gave and defense counsel's objection that it was nonresponsive was sustained by the trial court and response struck.

As to both Courtney and Detective Smythe's later testimony, we presume jurors follow the trial court's instructions not to consider the evidence. (*People v. Letner and Tobin, supra,* 50 Cal.4th at p. 172; *People v. Young, supra,* 34 Cal.4th at p. 1214.)

In any event, even assuming prosecutorial misconduct occurred, it is not reasonably probable that appellant would have received a more favorable result absent the misconduct. (*People v. Tully* (2012) 54 Cal.4th 952, 1010 [defendant's conviction

will not be reversed for prosecutorial misconduct unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct].) Here, any possible prejudice that could have resulted from evidence that appellant was unemployed was minor in comparison to the substantial evidence of the charged crimes and the uncharged domestic violence. There was no suggestion that the alleged crime was motivated by any financial gain, and the fact that appellant was unemployed did not make it more likely that he committed the crimes. (See *People v. Shoals* (1992) 8 Cal.App.4th 475, 494 [references to the defendant's unemployed status in drug sales was harmless where employment status was a "minor point" in comparison to the substantial evidence of guilt].) It is not reasonably probable appellant's employment status had any effect on the jury's verdicts.

### c. *Dr. Hyman's testimony about appellant's police record*

Appellant next contends that the prosecutor committed misconduct in cross-examination of defense expert Dr. Hyman. We find no prosecutorial misconduct in this instance.

Dr. Hyman's testimony for the defense questioned the prosecution's evidence for the date and cause of Peyton's injuries, suggesting the injuries were caused by the medical staff during treatment and by Peyton's bone fragility.

During cross-examination, the prosecutor noted Dr. Hyman's report and that it alluded to appellant having a "concerning police record" and "anger issues." Dr. Hyman responded that it was included in the report because "we don't hide anything" and it was something that "has to be considered" by both Dr. Hyman and the prosecutor. When asked if Dr. Hyman received information about appellant's history, Dr. Hyman replied that he had received some information "associated with prior relationships that in one history that we got it was stated that the partner or spouse or whomever it was was assaultive to him and broke his nose on some occasions, and he responded also with physical abuse," but that this information was "speculative."

80.

The following day, defense counsel objected to the prosecutor's question regarding appellant's police record and asked that the jury be instructed that appellant did not have any felony convictions. The trial court subsequently instructed the jury, with defense counsel's agreement that, while appellant had a past misdemeanor conviction, he did not have any felony convictions.

Here, we find no misconduct on the part of the prosecutor. " 'An expert may be cross-examined regarding the subject to which his testimony relates, the matter on which he basis his opinion, and the reasons for his opinion.' " (*People v. Pearson, supra,* 56 Cal.4th at p. 436.) " ' " 'Once an expert offers his opinion … he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, *the reasons for his opinion including facts and other matters upon which it is based* [citation], and which he took into consideration; and he may be "*subjected to the most rigid cross-examination*" *concerning* his qualifications, and *his opinion and its sources* [citation].' " ' " (*People v. Rodriguez* (2014) 58 Cal.4th 587, 647, original italics.)

As noted by Dr. Hyman in his cross-examination testimony, the reason his report included reference to appellant's police record and anger issues was because "it has to be considered" in his analysis and opinion. And the prosecutor was entitled to discredit Dr. Hyman's opinion that Peyton's injuries were not caused by child abuse despite the information Dr. Hyman received on appellant's police record and anger issues. (See *People v. Rodriguez, supra,* 58 Cal.4th at p. 647 [prosecutor was entitled to discredit expert's opinion that defendant was a loving mother by establishing that expert maintained that opinion despite knowledge that defendant's nine-year-old daughter had told police that she had unwittingly helped defendant poison the victim].)

No prosecutorial misconduct occurred in this instance, and we reject appellant's claim to the contrary.

### d. Testimony on the nature of Peyton's injuries

Appellant next contends prosecutorial misconduct occurred by eliciting expert testimony that Peyton's injuries were caused by "child abuse" and that her death was the result of "abusive" and "inflicted" trauma. We have addressed the admissibility of this testimony at length in part A., above, and need not do so again here.

### e. Impeaching Holly with evidence of prior inconsistent statements.

Appellant argues that the prosecutor committed misconduct when she impeached Holly with evidence of her prior inconsistent statements. We addressed the admissibility of this testimony in part D., above, and need not do so again here.

### f. Impeaching S.G. with evidence of prior inconsistent statements.

Appellant argues that the prosecutor committed misconduct when she impeached S.G. with evidence of her prior inconsistent statements. We addressed the admissibility of this testimony in part E., above, and need not do so again here.

### g. Prosecutorial misconduct in cross-examination of Dr. Hyman

Appellant argues that the prosecutor committed misconduct during Dr. Hyman's cross-examination by exceeding the scope of impeachment allowed by the trial court.[9] We find no error.

During cross-examination of Dr. Hyman, just prior to recessing for the day, the prosecutor asked whether Dr. Hyman recalled testifying in a previous case (Y.M.) in Fresno in 2009. Dr. Hyman replied that he did not.

The following day, defense counsel objected to the prosecutor asking Dr. Hyman questions about previous cases he had testified in, stating it would involve an undue consumption of time. The trial court ruled that the prosecutor could impeach Dr. Hyman with his prior testimony, but it stated it would not allow evidence that "a court has decided contrary to what Dr. Hyman testified." The prosecutor stated that she was going

---

[9] This is a slightly different argument than that made in part J.2.c., above.

82.

to address cases where Dr. Hyman testified and ask what he testified to, and noted that, in each case, Dr. Hyman testified that the child had not been abused. The trial court stated it would allow such impeachment. The prosecutor stated she would limit it to five cases.

The prosecutor then resumed cross-examination of Dr. Hyman and he confirmed that he testified in the Y.M. case. Dr. Hyman confirmed that he had testified about the child's fractures in that case and said he could "possibl[y]" have testified that the child had a vitamin D deficiency and rickets. When asked whether Dr. Hyman believed that child in that case had been abused, Dr. Hyman replied that he would not have taken the case if he believed the child had been abused. Dr. Hyman testified similarly to questions about a case involving two children (S.E.) and another child (K.S.), both in San Bernardino in 2014. As for another case he had testified in (Morgan M.) in San Diego in 2013, Dr. Hyman confirmed that the lower court had said it did not find his testimony credible, but Dr. Hyman noted that case had been reversed on appeal. And, Dr. Hyman acknowledged that he had been excluded as a witness in another case (Skyler M.) because of concerns that he had committed perjury after denying having notes pertaining to that case. Defense counsel did not object to any of the prosecutor's questions.

During closing argument, the prosecutor discussed Dr. Hyman's lack of experience and training and noted the prior cases where other courts had found Dr. Hyman was unreliable. The trial court then sustained a defense objection that the prosecutor had misstated the evidence and granted defense counsel's request to strike the prosecutor's remarks.

As stated previously, a defendant may not complain on appeal about prosecutorial misconduct unless he or she makes a timely objection in the trial court and requests that the jury be admonished. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.) As such, appellant's claim of questioning Dr. Hyman in this instance has been forfeited as no objection was made.

83.

In any event, we find no prosecutorial misconduct occurred here. Again, the scope of cross-examination of an expert witness is especially broad and a prosecutor may bring in facts beyond those introduced on direct examination in order to explore the grounds and reliability of the expert's opinion. (*People v. Lancaster* (2007) 41 Cal.4th 50, 105; § 721, subd. (a).) Here, the prosecutor asked Dr. Hyman questions directly related to his credibility and the reliability of his opinions. The prosecutor, in keeping with the trial court's ruling, did not ask Dr. Hyman about the ultimate outcome of any of the cases addressed.

To the extent appellant is arguing that the prosecutor committed misconduct during closing argument, the trial court sustained the defense objection and struck the prosecutor's argument. The jury was also instructed with CALCRIM No. 222 that remarks by the attorneys during closing argument are not evidence.

Appellant fails to demonstrate any misconduct in this instance.

### h. *Vouching for a witness*

Appellant next contends the prosecutor committed misconduct by vouching for a prosecution witness, Dr. Bruhn. During rebuttal, the prosecutor had stated, "Now, the other thing that seemed to be a really big contention is [Peyton's] fall. And Dr. Bruhn, who I've known a long time, and that guy's got the greatest memory. He remembers facts, things." At this point, defense counsel objected. The trial court sustained the objection and ordered that the prosecutor's remark be stricken.

A prosecutor may not vouch for the credibility of a witness or otherwise bolster the veracity of their testimony by referring to evidence outside the record. (*People v. Frye* (1998) 18 Cal.4th 894, 971, disapproved on other grounds in *Doolin, supra,* 45 Cal.4th at p. 421 & fn. 22; *People v. Sully* (1991) 53 Cal.3d 1195, 1235.)

However, even finding that the prosecutor committed impermissible vouching, there is no reasonable probability that appellant would have achieved a better result absent the prosecutor's remark. (See *People v. Tully, supra,* 54 Cal.4th at p. 1010

[applying *Watson* standard to evaluate whether misconduct was harmless].) The prosecutor's statement here was brief and was not repeated. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1130 [finding no prejudice where prosecutor's comment was "brief, mild, and not repeated"].) More importantly, the statement made by the prosecutor did not hinge on the credibility of Dr. Bruhn's testimony. (See *People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1584–1586 [prosecutor's improper vouching of key witness during rebuttal argument was incurably prejudicial where prosecution's case was entirely dependent on the credibility of the witness].) And finally, any possible prejudice was cured by the trial court striking the remark.

> ### i. *Arguing facts outside the evidence*

Appellant next contends numerous instances of misconduct occurred when the prosecutor misstated the evidence or argued facts outside the evidence. Appellant has forfeited a number of these claims and, as to the rest, we find no prejudicial misconduct.

> *1.* While discussing S.G.'s testimony during closing argument, the prosecutor stated: "Then you had where they kind of open up the door on the testimony, so [S.G.] was not allowed to testify about how this defendant treated Madison, what [S.G.] actually saw." Appellant claims the prosecutor's remarks were an improper reference to facts outside the record and insinuated there was more evidence that was not revealed to the jury. Defense counsel made no objection to this statement nor requested that the jury be admonished to disregard the remark. As such, we find appellant's claim on appeal has been forfeited. (*People v. Stanley* (2006) 39 Cal.4th 913, 952.)

> *2.* The paramedic who initially responded to the scene testified on direct examination that Peyton's color was "pale, cool, with no signs of life." On cross-examination, the paramedic testified Peyton still "felt warm." In closing, the prosecutor twice argued the responding paramedic said Peyton was "pale" and "cold to the touch." Defense counsel objected during both instances on

grounds that the prosecutor had misstated the evidence, stating that the paramedic had testified that P. felt "warm." The trial court overruled the objections and stated that it was a matter for the jury to decide. A prosecutor is afforded wide latitude to discuss and draw inferences from the evidence presented, and it is for the jury to decide whether those inferences are reasonable. (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) In addition, the jury was instructed pursuant to CALCRIM No. 222 that arguments by counsel are not evidence.

3. At trial, Devyn testified that, while appellant was hitting her, Madison woke up and began crying. Appellant told Madison to turn around, lie down, and go back to sleep and, when she did not, he grabbed Madison by the arm and leg, picked her up and forcefully put her down on her face while still yelling at her. During closing, the prosecutor argued that Devyn woke to appellant picking her up by the hair, that Madison witnessed the event, and that appellant grabbed Madison, "slams her down on the bed, telling her to turn around. Turn around, you know, while I beat the hell out of this woman, that type of thing. Imagine a little girl's gonna see something like that." The trial court overruled defense counsel's objection that the prosecutor had misstated the evidence. Again, given the prosecutor's wide latitude in commenting on the evidence, this was a fair comment.

4. During Dorothy's testimony, she began testifying about things Devyn had told her. The trial court sustained defense counsel's objection that the testimony contained multiple levels of hearsay. During closing, the prosecutor commented on Dorothy's testimony and that "they're very limited in what they can testify." And in concluding her discussion on the uncharged domestic violence evidence, the prosecutor stated appellant had a violent history and this violence "started at a very young age for him, and it just kept going." Defense

86.

counsel did not object to either statement at the time, but later objected to both of these statements as indicating there was more evidence that did not come in at trial. Even if appellant's claim is preserved on appeal, the statement on limited testimony was in reference to how Dorothy could only testify to what she personally saw and not what Devyn told her about the incident, as the trial court ruled during Dorothy's testimony. As for the statement that appellant's violent history began at a young age, the jury was very aware of uncharged domestic violence involving appellant beginning in high school. The jury was instructed that argument by counsel was not evidence, and it is not reasonably probable that appellant would have achieved a better outcome absent these two comments by the prosecutor. (*People v. Tully, supra,* 54 Cal.4th at p. 1010.)

5. At trial, Dorothy testified to an incident in which she entered Devyn and appellant's room and found newborn D.M. crying with a blanket completely covering his face and head. Dorothy testified that appellant told her he did the same thing for Madison to put her to sleep. During closing argument, the prosecutor referred to the incident and described the blanket as "heavy." Defense counsel did not object at the time. Later, outside the presence of the jury, defense counsel objected to the use of the word "heavy," stating that was not in the record. The trial court stated that defense counsel could "easily" address that in closing argument. Again, assuming the issue is preserved on appeal, we find no prejudicial error. The jury was instructed that argument by counsel was not evidence, and it is not reasonably probable that appellant would have achieved a better outcome absent this comment by the prosecutor. (*People v. Tully, supra,* 54 Cal.4th at p. 1010.)

6. At trial, Devyn testified that, on the day she was assaulted, appellant picked up D.M. and squeezed him tight. Also at trial, Dr. Bruhn testified that in holding a baby by the chest and shaking the child, the ribs are squeezed and can be

fractured. In closing, the prosecutor referred to appellant picking up and squeezing D.M. and added, "you heard Dr. Bruhn, when they do that, they squeeze them like that, that's how they can break those posterior rib[s] on a baby." Defense counsel objected on grounds that the prosecutor's argument misstated the evidence. The trial court overruled the objection, stating "It's [a] reasonable argument, go ahead." Again, the comment by the prosecutor was within the wide latitude given a prosecutor in argument, and no error occurred.

7. At trial, Dr. Vogel testified that he viewed a portion of Peyton's temporal lobe under a microscope and observed a recent injury to the neurons, an infarction, "the medical term … for death of the neurons." Dr. Vogel also testified that he observed bleeding in Peyton's brain that could have been caused by blunt force trauma. During closing, the prosecutor argued that Dr. Vogel did a microscopic examination of Peyton's brain and noted an infarct and a subarachnoid hemorrhage, and that the "infarct part means that its dying. That part of the brain area died from some sort of blunt force trauma." Defense counsel objected on grounds of misstating the evidence (defense expert Dr. Leetsma had testified that an infarction is caused by insufficient oxygen, blood flow, or glucose). The trial court overruled the objection, stating it was a matter for the jury to decide. Appellant contends on appeal that the medical evidence was complex, and the jury likely relied on the prosecution's interpretation of the evidence, which was "an extreme exaggeration on a very critical point." Again, we find no error occurred, as the prosecutor has wide latitude in argument, and it was for the jury to decide what it believed.

8. In closing, the prosecutor described Courtney as working fulltime, living in a two-bedroom apartment, and having a car, and "[w]e know [appellant] wasn't working." The trial court overruled defense counsel's objection to this statement. Appellant contends this was misconduct on the part of the

88.

prosecutor because, despite the fact that the trial court struck all evidence of appellant not being employed, the prosecutor repeated this evidence "over and over again." We have addressed the issue of appellant's lack of employment at length in part J.2.b., above, and again find no prejudice from this statement by the prosecutor.

9. At trial, during cross-examination, Dr. Leetsma testified that he had been testifying for the defense for about 35 years after he stopped believing in the validity of shaken baby syndrome. During rebuttal argument, the prosecutor argued that Dr. Leetsma "only testifies for the defense, and he admits he's biased." Defense counsel objected on grounds that the prosecutor misstated the evidence. The trial court overruled the objection, stating it was "pure argument" which was "all right." Appellant contends Dr. Leetsma never admitted he was biased but the statement by the prosecutor could lead the jury to "surmise the prosecutor possessed some source of information." Again, we find the prosecutor's statement was a permissible inference based on Dr. Leetsma's testimony and reject appellant's claim to the contrary.

10. At trial, Detective Smythe testified that, when he first interviewed appellant, appellant told him that he had days earlier tripped over the dog while holding Peyton, causing him to fall on the floor. In a second interview two days later, which was recorded, Smythe testified that appellant told him the same thing. The prosecutor then directed Smythe to a page in the second interview in which appellant stated he tripped over the dog and the ottoman and fell on top of Peyton. In closing argument, the prosecutor highlighted the differences between the two versions, intimating the story was a lie. Later, outside the presence of the jury, defense counsel objected that the prosecutor had misrepresented the evidence by arguing that appellant provided two different versions of the fall. The trial court disagreed, finding there was no

misstatement of the evidence. The following day, after consulting the record, defense counsel again argued that the prosecutor's statement that there were two versions of the event given by appellant was not true and could not "argue that away." The trial court stated that defense counsel could argue the opposite "if the record indicates differently." The trial court rejected defense counsel's request for a curative instruction, noting that, if defense counsel wanted to "point it out to the jury, that's what closing argument's all about." We find no misconduct. The prosecutor's argument that appellant's version of events had evolved and changed over time was permissible argument.

11. Prior to sentencing, the prosecutor filed a statement in aggravation, noting several times that appellant had "tortured and beat" Peyton to death. The trial court reminded the prosecutor that the torture special circumstance had not been found true by the jury and that reference to torture was "distracting" and "lacked credibility." Appellant argues that the prosecutor's posttrial statement in aggravation supports his argument that the prosecutor engaged in a pattern of misconduct throughout the trial. We agree with respondent that, while use of the term torture was imprudent, it did not have any effect on the jury's already rendered verdicts, nor did it have any effect on appellant's 15 years to life sentence, which was determined by law.

K. DID THE TRIAL COURT ABUSE ITS DISCRETION WHEN IT DIRECTED THE JURY TO CONTINUE DELIBERATING TO REACH A VERDICT?

Appellant next contends that the trial court erred when it told one of the jurors to disregard an incident involving her sister and by directing the jury to continue deliberations after the foreperson stated that at least one of the jurors was not participating in deliberations and they had reached an impasse. We find no error.

### 1. Procedural Background

On the third day of deliberations, the foreperson sent a note to the trial court stating that one juror had "shared today that her younger sister fell out of a crib and hit her head on a carpeted surface and now is blind and mentally handicapped," and that another juror felt this was a conflict of interest. The trial judge was absent at the time. The substitute judge released the jurors until the following Monday.

When court reconvened at the beginning of the next week, the trial court questioned the foreperson about the note. According to the foreperson, Juror No. 6 had shared a story about her younger sister falling out of a crib, which made a few of the jurors uncomfortable. When asked what Juror No. 6 had said, the foreperson explained as follows:

> "We were deliberating and talking about probable cause and going back and forth about the degrees and what to choose. We've had some difficult conversations in this case, in this deliberation process. The juror is one that is not very open and won't share openly.

> "All of the sudden out of nowhere she said, out of nowhere, 'My sister, when she was little,' I think she said under one years old, 'fell out of a crib. She's now blind and retarded,' is the word she said. And okay? What's going on? So we all look and pay attention to her. And she said, 'So any of this could have happened. Any of this could have been an accident. Any of this could have been on purpose. We don't know. That's why I'm not talking. That's why I don't want to share my opinion." And just continued to share her story. And said that her parents take care of her now and she's older now, of course, but its been an issue in her family that she was sensitive to."

The foreperson described Juror No. 6 as "very, very quiet compared to everyone else, and not openly sharing her opinion." The foreperson stated that Juror No. 6 "doesn't want to say more than one or two words," and it has been "a struggle." Two other jurors asked that the foreperson write the note to the court.

The trial court then brought in Juror No. 6 and asked what she had shared with the other jurors. Juror No. 6 stated that she told the other jurors about her sister's fall when

they were adamant that a fall from that height could not injure someone.  She claimed not to have thought of the incident until the height of the fall was discussed.  Juror No. 6 stated that the incident with her sister happened before Juror No. 6 was born.  Juror No. 6 stated that she did not feel her experience would make it hard for her to consider all of the evidence in the case and that she was not relying solely on that experience and believed she could deliberate further.

After Juror No. 6 left the courtroom, the trial court ruled "that type of discussion is beyond the common experience of the jurors," and it was "clearly extraneous evidence" that Juror No. 6 was not a witness to.

Juror No. 6 was called back into the court and asked if she could set aside the experience involving her sister and not allow it to be a part of her deliberative process.  Juror No. 6 replied, "Absolutely" and would only decide the case on the evidence.  The trial court reminded Juror No. 6 that all jurors needed to participate in the deliberation process and that other jurors were concerned that she was not fully participating.  Juror No. 6 stated that she was "expressing my opinion; I'm just not going with what they think."  Juror No. 6 stated that one of the trial court's instructions was that she was not to let another juror persuade her, and she was "going off of the evidence and the facts," and that "because I'm not changing my mind, they are thinking maybe I'm not talking enough, but I believe I am."

The rest of the jury was then brought into the courtroom and the trial court informed them that an alternate juror had been chosen to replace a juror who had left on a preplanned vacation.  The trial court then instructed the jurors that they had to disregard all past deliberations and begin deliberations again with the replaced juror.

The following morning, Juror No. 6 sent a note to the trial court that she wished to speak to the judge, as one of other jurors had brought Juror No. 6's "situation" up in front of the rest of the jury and used foul language.  The trial court brought Juror No. 6 into the courtroom and asked what had happened.  Juror No. 6 stated that, when the replacement

juror said they would be starting deliberations over, Juror No. 2 had said "he didn't give a shit," and said, "At least I'm not using my family history like you are." Juror No. 6 also stated that, the week before, Juror No. 2 had told her that she was going to "let a baby killer go free" because of the way she was feeling.

The trial court then brought in Juror No. 2 who acknowledged he had used foul language which was inappropriate. He stated that he was fine with starting deliberations over. His fear had been that "no one was going to participate, but now that there's someone new, everybody's kind of discussing it from different angles." The trial court then brought in the rest of the jury and reinstructed them on how to conduct deliberations and told them to treat one another courteously.

Later that afternoon, the foreperson sent a note asking to speak to the trial court. When called into the courtroom, the foreperson stated that he felt that they were at a point where he felt like a "mom" trying to get everyone to behave and act like adults. The foreperson explained:

> "We have a couple of jurors who are saying, nope, I'm done, I'm over, I'm not going to talk anymore. This is it. I'm not coming back. I'll tell the judge I have some thing going on. You'll get an alternate and you'll start over, because there's people who have certain feelings about certain things and they're wanting us to explain why they feel that way. That's what we're supposed to be doing, but not everybody is actively involved in those discussions. And it's getting to the point where it's very contentious. [¶] … [¶] A person's life is in the balance, but it's making me wonder if people are just being stubborn or if they're really being an open-minded juror and what we do about that, how we overcome this barrier. I feel like we're at a roadblock right now where we're just kind of walking in circles. And the jury is struggling."

After the foreperson left the courtroom, defense counsel and the prosecutor disagreed as to who was to blame for the impasse. The trial court stated that it was going to bring out the jury and tell them their goal, if possible, was to reach a verdict, but if it was to a point where they felt that they had deliberated and nothing was going to change, "we have an impasse and a hung jury." The trial court stated that it would ask the jury if

93.

there was a particular instruction they wanted reread, it would, but other than that "I don't know what else we can tell them."

The entire jury was then brought in and the court addressed them as follows:

"Just a few comments, because I get the impression that you're struggling, and sometimes that happens. Obviously, the main goal of jury deliberations is to reach verdicts, if you can do so. Sometimes jurors can't do so. But if you're going to have a deliberation process, it has to involve all 12 of you. You have to be able to talk and exchange thoughts and ideas in a respectful way.

"Now, if someone feels that they've done all the talking they're going to do and they've absolutely made up their mind and they're not going to change it, that's one thing. That's fine. We can honor that. What we can't have is someone on the jury who says I'm not going to deliberate. I don't care what anybody tells me. I'm just of a mindset and I'm not going to change it. That's another.

"But if that person's already gone through the process and they've talked it out and they're not going to change their mind, that happened sometimes. But I want to have 12 people who can actually talk it out with their fellow jurors, talk the issues, and see if they can arrive at verdicts. Okay?"

The jury declined the trial court's offer to read back or clarify any instructions. When asked if they had reached a verdict, the foreperson stated that they were still considering count 1 and had not yet begun deliberations on count 2.

The jury returned its verdicts the following morning at 11:30 a.m.

2. *Applicable Law and Analysis*

Penal Code section 1140 provides that "the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." " 'The determination whether there is reasonable probability of agreement rests in the discretion of the trial court. [Citations.] The court must exercise its power, however, without coercion of the jury, so

94.

as to avoid displacing the jury's independent judgment "in favor of considerations of compromise and expediency." [Citation.]' [Citation.] The question of coercion is necessarily dependent on the facts and circumstances of each case." (*People v. Sandoval* (1992) 4 Cal.4th 155, 195–196.)

In *People v. Thomas* (1991) 231 Cal.App.3d 299 (*Thomas*), the jury informed the trial court it was deadlocked, and each juror said it would not be productive to continue deliberations. (*Id.* at p. 302.) The trial court asked for "a show of hands in response to the question, 'Do you think it would be at all helpful to you if the court gave you further instructions on the law,' " and only one juror raised their hand. (*Ibid.*) The trial court asked the jury to continue deliberating and reminded the jurors they could ask the court for clarification on the law. (*Ibid.*) The jury returned to the jury room, did not ask any further questions, and reached a verdict shortly thereafter. (*Ibid.*)

The court in *Thomas* determined there was nothing improper about the trial court's actions, noting that asking the jury "to consider whether further instruction on the law would assist them in reaching a verdict ... was entirely within the scope of the court's discretion." (*Thomas, supra,* 231 Cal.App.3d at p. 303.) Importantly, "[t]he court made no remarks that could reasonably be interpreted as coercive, nor did it urge the jury to come to an agreement on either of the counts." (*Ibid.*) Thus, there was "no impropriety in the court's management of the impasse in the jury's deliberations." (*Id.* at p. 304.)

Here, when the foreperson stated the jury was at an impasse, the trial court spoke to the entire jury and acknowledged that they were struggling and instructed them that their main goal of deliberations was to reach a verdict, if they could, but that "[s]ometimes jurors can't do so." The trial court reminded the jurors that the deliberation process had to involve all 12 jurors but that, if someone felt that they had "done all the talking they're going to do and they've absolutely made up their mind and they're not going to change it …. That's fine. We can honor that." The trial court then asked the jury if they wanted any read back or clarification of instructions, but the jury declined.

As in *Thomas,* the trial court avoided any comments that could be construed as coercive. (*Thomas, supra,* 231 Cal.App.3d at p. 303.)

Appellant also contends that the trial court erred when it failed to first inquire of the jurors whether additional deliberation would be helpful. However, in determining whether there is a reasonable probability that the jury could agree on a verdict with additional deliberation, the court is not required to ask the jurors whether there is such a reasonable probability before giving them additional instructions. (*People v. Moore* (2002) 96 Cal.App.4th 1105, 1121.) In *Moore*, the court observed: "In this case, and presumably because of the relatively brief duration of deliberations conducted by the jurors before they announced they could not reach a verdict on count one, the trial court concluded further deliberations might be beneficial without questioning the jury regarding the impasse. The fact the jury was able to reach a verdict relatively quickly after being further instructed reflects the court properly exercised its discretion." (*Id.* at p. 1122.) Here, the jury had only deliberated for one day following the substitution of a juror, thus the court could reasonably conclude that there was a reasonable probability the jurors could reach an agreement. Thus, the court's decision to not question the jury before sending them back to deliberate further was not necessarily an abuse of discretion.

Appellant also contends that the trial court erred in how it dealt with Juror No. 6 and the incident involving her sister. Appellant argues that, consistent with CALCRIM Nos. 226[10], 302[11], and 332[12], Juror No. 6 was justified and entitled to consider her "personal experience" is assessing the credibility of conflicting experts on the question of

---

[10]   CALCRIM No. 226 instructs jurors, when deciding whether testimony is true and correct, to use their "common sense and experience."

[11]   CALCRIM No. 302 instructs jurors not to simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses.

[12]   CALCRIM No. 332 instructs jurors to consider the opinion of witnesses testifying as experts but that they are not required to accept them as true or correct.

accident versus inflicted abuse, and it was error for the trial court to insist that Juror No. 6 put her "personal experience" aside in continued deliberations, which she promised to do. We find no prejudicial error.

It is true that a juror does not commit misconduct merely by describing a personal experience in the course of deliberations (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 819), and courts "expect jurors to use their own life experiences when evaluating the evidence." (*People v. Wilson, supra,* 44 Cal.4th at p. 823.) As noted, above, jurors were instructed to use their "common sense and experience." However, Juror No. 6 explained that she had not yet been born when the incident happened, and the trial court found that she had therefore not personally experienced it. We find no abuse of discretion on the part of the trial court in its determination that the incident involving Juror No. 6's sister was extraneous evidence not to be considered.

In any event, we disagree with appellant that the resulting "compromise verdict" is the result of the trial court's "coercive circumstances" and must be set aside. Appellant was acquitted of first degree murder and assault on a child causing death, but found guilty of second degree murder and guilty of assault with force likely to produce great bodily injury. As argued by appellant, the jury was instructed on the elements of express and implied malice murder based on an affirmative act in CALCRIM No. 520 as alleged in count 1. The jury was also instructed on the elements of the offense alleged in count 2, child abuse homicide, pursuant to CALCRIM No. 820 , which required proof of the following, none of which are required for murder: (1) the age of the victim be under the age of eight, (2) the assailant must occupy the role of caretaker of the child, and (3) the assailant must commit an assault with force such that a reasonable person would know it was likely to inflict great bodily injury. (*People v. Albritton* (1998) 67 Cal.App.4th 647, 655.) The trial court also instructed with CALCRIM No. 875 on aggravated assault, as a lesser included offense for count 2, which has the same elements to child abuse homicide

97.

except for the age of the victim, the caretaker's relationship with the victim, and the death of the victim—all elements appellant argues were not at issue.

As noted above, the jury returned a verdict for second-degree murder which, according to appellant, "becomes the same offense as child-abuse homicide with the addition of implied malice." But, as appellant argues further, "the jury found [appellant] *not guilty* of child-abuse homicide, although guilty of second-degree murder and assault likely to cause great bodily injury." (Original italics.) This, appellant contends is an inconsistent verdict, which "appear[s] to be the result of improper vote bartering or compromise stemming from the court's directions to Juror No. 6 to completely disregard her personal experience, and to the entire jury to continue deliberating despite impasse." Appellant argues further that, "[g]iven the totality of the evidence the … jurors were at an impasse over [appellant's] innocence as to all charges," and "it is reasonably probable, absent the court's errors, [appellant] would have received a more favorable result."

We disagree. An inconsistent verdict "may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict." (*People v. Lewis* (2001) 25 Cal.4th 610, 656; see *People v. Pahl* (1991) 226 Cal.App.3d 1651, 1656 [noting validity of inconsistent verdicts that are "probably the result of compromise in the jury room or of an extension of leniency or mercy to the defendant"].) Even were we to conclude that there was any inconsistency in the jury's findings, "inconsistent verdicts are allowed to stand." (*People v. Lewis, supra,* 25 Cal.4th at p. 656 ["It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand.... [¶] We have conducted an independent review of the record and ... have determined there is sufficient evidence to support the convictions and findings rendered in this case. Thus, even if we assume for argument's sake that the jury verdicts were inconsistent, that conclusion does not, of itself, warrant reversal."].) Appellant does not contest the sufficiency of the evidence to support the convictions.

The trial court acted well within its discretion in concluding that there was a reasonable probability the jurors could still reach an agreement, and nothing about the trial court's conduct or comments to the jury was coercive.

L.  CUMULATIVE ERROR?

Appellant contends finally that the cumulative effect of all of the above errors deprived him of a fair trial.  We have either rejected appellant's claims of error and/or found any errors, presumed or not, were not prejudicial. Viewed cumulatively, we find any errors do not warrant reversal of the judgment.  (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

**DISPOSITION**

The judgment is affirmed.

FRANSON, J.

WE CONCUR:

DETJEN, ACTING P. J.

MEEHAN, J.